IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35316-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRYAN JACK ROSS CROW, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — The trial court, after a jury trial, convicted Bryan Crow of the

crimes of unlawful possession of a firearm and possession of a stolen firearm. On appeal,

we reverse Crow's conviction of possession of a stolen firearm because his trial counsel

ineffectively failed to object to inadmissible profile testimony and the testimony

prejudiced Crow's defense. Based on state Supreme Court precedent, we also remand for

resentencing because the State failed to present sufficient proof of crimes included in

Crow's offender score calculation.

FACTS

We take our facts from testimony during a jury trial. We start with a stolen gun.

On October 22, 2014, Joseph Carnevali returned to his pickup truck parked in downtown

Seattle and discovered his Ruger 9mm LC9 handgun, he stored in the pickup console, to be missing. Carnevali reported the stolen firearm and identified the firearm's serial number to the Seattle Police Department.

We move from Seattle to Yakima. On June 13, 2015, Officer Chris Taylor of the Yakima Police Department patrolled the streets of Yakima in a marked police car. Officer Taylor saw Bryan Crow exit a vehicle parked at a residence. Taylor recognized Crow from earlier contacts and from Crow's horn tattoos on his head. Officer Taylor knew Crow had a warrant for his arrest.

Officer Chris Taylor approached Bryan Crow and, from a comfortable distance, called Crow's name. Crow turned and looked at Officer Taylor and then ran. Taylor yelled: "stop, you're under arrest." Report of Proceedings (RP) at 173.

Officer Chris Taylor, while eight to ten feet from Bryan Crow, fired a Taser at Crow. The Taser caused Crow to stumble, but otherwise did not disable Crow. Crow reached into his waistband with his right hand and retrieved a handgun. Crow flung the weapon and continued to run from Officer Taylor. Officer Taylor threw his Taser to the ground and drew his service firearm. Crow jumped a fence and continued running, after which Taylor ended his chase. Taylor took possession of the handgun Crow discarded. Taylor knew then that prior convictions rendered Crow ineligible from owning firearms. Officer Taylor radioed for assistance, and other Yakima Police Department officers later seized Crow.

2

Officer Chris Taylor transported Bryan Crow to the county jail. Officer Taylor entered the serial number from the gun, a Ruger 9mm handgun, into the gun registry index. The check revealed that the gun had been stolen in Seattle on October 23, 2014.

PROCEDURE

The State of Washington charged Bryan Crow with first degree unlawful possession of a firearm and possession of a stolen firearm. At trial, Crow stipulated to an earlier conviction that precluded him from possessing a firearm. During trial, Crow argued that he lacked knowledge that the Ruger firearm was stolen.

During trial, the prosecution introduced police testimony outlining patterns regarding felons and stolen firearms and the difficulty of a felon gaining possession of a firearm. Bryan Crow's trial counsel did not object to any of this questioning. The police testimony and the lack of evidentiary objections presents the focus of this appeal.

The State questioned Officer Chris Taylor regarding the method by which and the location at which a person can legally purchase a firearm. When asked if someone could lawfully sell, gift, or transfer a gun to Crow, Officer Taylor answered: "No." RP at 195.

On cross-examination, Crow's attorney asked questions of Taylor regarding how someone would know if a gun is stolen or not:

> [Defense Counsel]: You testified about the firearm that was recovered. The serial numbers, and I understand from your testimony, the serial numbers weren't ground off?
> TAYLOR: Correct.

3

[Defense Counsel]: How is—how is someone supposed to know if a gun is stolen or not?

TAYLOR: There's two ways. Obviously, the direct knowledge would be if they stole it, but a lot of times the way that I found people that know the firearm was stolen that they buy it illegally. If they buy it on the street from somebody who's not a legitimate gun salesman, buy it for a cheap price, most of the people that I come into contact with stolen firearms will say they bought it from somebody for fifty bucks, a hundred bucks. They assume that it's stolen based on the fact that it's not a legitimate gun sale and they're buying it so cheap.

RP at 198-99.

On redirect examination, the State inquired about the methods by which prohibited persons obtain firearms:

TAYLOR: From my training and experience, they [those prohibited from possessing firearms] either will steal them or they will buy them from somebody that is selling them illegally on the street.

[The State]: Okay and how are those illegally obtained firearms, where do they typically come from in your training and experience?

TAYLOR: Burglaries, vehicle prowls, things like that.

[The State]: In your training and experience, do fleeing suspects often attempt to discard stolen property when they're being pursued?

TAYLOR: Yes.

[The State]: Why is that?

TAYLOR: Because nobody wants to be caught with stuff that they know they shouldn't have.

[The State]: In your training and experience, what actions are indicative of somebody knowing something is stolen property?

TAYLOR: Typically they're going to try to distance themselves as much as possible from it. They'll tell you stuff like I have no idea about it, I don't know anything about it, I don't know who I got it from or they'll give you very vague answers. I got it from Bob, over there, around this time. There's no specifics that you're able—what they try to do is make it so there's no specifics that you can follow up with to confirm whether they knew or not knew or did not know that it was stolen.

[The State]: So, discarding and flight are pretty common?

4

TAYLOR: Correct.

. . . .

[The State]: … Okay. In your training and experience, what percentage of people apprehended are prohibited people with firearms are those guns stolen?

TAYLOR: Pretty high percentage. I would—I couldn't guess a number, but I would say the majority.

[The State]: Okay. And—and in the case where those firearms are not reported, is there a reason that sometimes they're not reported as stolen or not in the system?

TAYLOR: A lot of times we come across firearms that are unregistered. Maybe they don't have an owner attached to it because they've been sold or transferred prior to Initiative 594 so there's not a record or the person who had the burglary with the firearms stolen doesn't have their serial numbers, so they're not able to list it. So, we're not able to confirm that the firearm is in fact stolen.

RP at 201-03.

During trial, Yakima Officer Booker Ward testified regarding the ways a person could illegally obtain a firearm. The testimony is as follows:

[The State]: Okay. In your training and experience, how do prohibited persons get firearms?

WARD: Usually through burglaries, vehicle prowls, some way of that nature.

[The State]: Okay, what percentage are stolen in your training and experience that turn up in prohibited person[']s hands?

WARD: I would say a high percentage.

[The State]: Okay, based on Mr. Crow's status of being convicted of a serious offense at the time of the arrest, were there any lawful means at that time for Bryan Crow to receive a firearm or possess a firearm?

WARD: Any, no he shouldn't have been able to. Not with the background checks and that kind of stuff.

[The State]: Okay, was there any lawful means which another person could give a prohibited person, such as Mr. Crow, a firearm?

WARD: No.

[The State]: No?

5

WARD: I don't believe so. You'd have to—once again, do the background checks and that kind of stuff and transfers and . . . .

RP at 219-20.

During trial, the prosecution asked similar questions to Detective Gonzalo Deloza:

[The State]: In your training and experience, what percentage of firearms possessed by prohibited persons are stolen?
DELOZA: It's hard—it's hard to say because a lot of the guns that are reported, not every has the serial numbers on them, but a lot of people—most of the people that I know that are prohibited from having firearms obviously they're not allowed to have them so they had to get them somewhere else and most of them are stolen.

RP at 239-40.

The trial court presented the jury two jury instructions that centered on the

possession of a stolen firearm charge:

INSTRUCTION NO. 15

To convict the defendant of the crime of possessing a stolen firearm, each of the following elements of the crime must be proved beyond a reasonable doubt:
(1) That on or about June 13, 2015, the defendant possessed, or carried, or was in control of stolen firearm; and
(2) *That the defendant acted with knowledge that the firearm had been stolen;* and
(3) That the defendant withheld or appropriated the firearm to the use of someone other than the true owner or person entitled thereto; and
(4) That any of these acts occurred in the State of Washington.
If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

Clerk's Papers (CP) at 169 (emphasis added).

INSTRUCTION NO. 9

A person knows or acts knowingly or with knowledge with respect to a fact, circumstance, or result when he or she is aware of that fact, circumstance, or result. It is not necessary that the person know that the fact, circumstance, or result is defined by law as being unlawful or an element of a crime.

If a person has information that would lead a reasonable person in the same situation to believe that a fact exists, the jury is permitted but not required to find that he or she acted with knowledge of that fact.

When acting knowingly as to a particular fact is required to establish an element of a crime, the element is also established if a person acts intentionally as to that fact.

CP at 163.

During closing statement, the State's counsel remarked:

What's our common sense tell us? The gun is stolen. What's the evidence show us? The testimony of all the officers, there's no way for him to lawfully get a gun. There's flight, there's discarding the evidence. Common practice of what I think Detective Gonzalez, Gonzo Deloza, excuse me, *they always try to get rid of it* thinking that then they have exonerated themselves essentially if they don't have it on their person. But, that's not the case of the law.

RP at 303 (emphasis added). During closing, defense counsel commented:

Now, more importantly or just as important, but more issues in it is possession of a stolen firearm. No evidence was presented that the defendant knew, had actual knowledge, that this was stolen. The State even concedes that it has no actual knowledge of this. That's why they had to use reasonable inferences to overcome or sugar coat the fact that they have no knowledge element in their case.

Now, the knowledge that he knew is Instruction No. 13 states that dispose of a stolen firearm knowing that it had been stolen. There has been

no evidence whatsoever that Mr. Crow knew that this gun was stolen.

. . . .

This is a case where there is a stolen firearm and there is no knowledge by the defendant and the State is trying to bootstrap another offense onto it. This is a case where they have no evidence whatsoever of knowledge and they have no evidence whatsoever that my client specifically knew, specifically knew. We're talking about did Mr. Crow [know] that this firearm was stolen. That's the standard right there. All this other inference and everything else is not an issue.

RP at 305-06. In rebuttal, the prosecution argued:

[Defense counsel] doesn't talk about or dispute whether or not he had actual possession of a firearm. He didn't do that. But, it's clear that he had possession. All the testimony and evidence shows that he had actual possession of a firearm. *It would be an impossible burden to have to prove actual knowledge.* What tool could we use that could get inside of somebody's head to find out what they actually know? Remember, it's proof beyond any doubt, well how could you ever prove what's inside somebody's head? I can't prove what's in your head right now at all, no more than what you could prove in mine. You may be thinking if I could go home as quickly as possible. I don't know. But, it would be an impossible burden. That's why the instructions are very clear.

. . . .

We heard the testimony. These guns are stolen. That's how *these guys are getting them*. Okay. They're stolen on the streets. They're stolen in burglaries, they're stolen in car prowls. What did we hear from Mr. Carnevali? Stolen in a car prowl. They're traded around. That's the common sense you've got to bring to the analysis of this case.

RP at 308-10 (emphasis added).

During deliberations, the jurors sent the trial court a note:

We believe a reasonable person would assume the firearm is stolen. Are we allowed to say the [d]efendant would believe the same and would that count as knowledge?

CP at 173. In response, the trial court referred the jury to the previously given jury

8

instructions. The jury convicted Bryan Crow of unlawful possession of a firearm and possession of a stolen firearm.

At Bryan Crow's sentencing, the State did not provide any document of record to show that Crow had been convicted of three prior adult felonies and one prior juvenile felony. At sentencing, in response to the trial judge's inquiry, the prosecution stated:

> [THE STATE]: Yes, Judge, I've laid out the criminal history. Mr. Crow is current on community custody or was at the time, I believe he still is if he would be in custody for assault three. Assault two, which was a case I had where he got a deadly weapon enhancement. He assaulted a kid on a bike with a knife. That was a case I have that he was on community custody for at the time he was caught with the firearm in this case, the stolen firearm. He has been convicted of bail jumping and another unlawful possession of a firearm as a juvenile.

RP at 337.

When sentencing Bryan Crow, the court commented:

> The Court also takes into consideration his prior criminal history, which in this Court's opinion is rather significant. We have a charge as a juvenile of unlawful possession of a firearm in the second degree, that having been committed on May 14, 2010.
> We have three felony convictions since adulthood. October 8, 2012, he was—he was engaged in felony bail jumping, in essence failed to show up for Court at a time when he had been ordered to. He acquired a strike offense, assault in the second degree with a deadly weapon for a crime allegedly or for a crime actually committed on August 10, 2013 and then just about three months later was charged with assault in the third degree, actually he wasn't charged, he committed the crime of assault in the third degree, which is a felony charge and those are significant because it shows a history of criminal violence and it shows a history of use of firearms or deadly weapons and at a time when he's not to be in possession of those.

9

RP at 340-41.  Bryan Crow did not object to the State's recitation of his criminal history or to the sentencing court's comments about the history.

The trial court calculated Bryan Crow's offender score as four and imposed a seventy-seven-month prison sentence.

LAW AND ANALYSIS

Bryan Crow appeals his conviction of possession of a stolen firearm and his sentence.  He does not appeal his conviction for unlawful possession of a firearm.  His argument to overturn his one conviction surrounds law enforcement officers' testimony concerning the probability that a firearm possessed by a convicted felon is a stolen gun.  Crow's trial counsel never objected to the testimony.  On appeal, Crow contends that the testimony constituted improper profile testimony and thereby violated his Sixth and Fourteenth Amendment rights.  He further contends that his trial counsel engaged in ineffective assistance of counsel by failing to object to the officers' testimony.  Because we agree that counsel engaged in ineffective assistance of counsel, we do not address Crow's contention that admission of the evidence was manifest constitutional error.

Bryan Crow's assignments of error demand that we first assess the admissibility of the law enforcement officers' testimony.  Assuming inadmissibility, we must also determine if Crow waived the inadmissibility by questioning one officer on the same subject matter.  We begin by asking whether the State presented objectionable testimony.

*Issue 1: Whether the State, when prosecuting a felon charged with possession of a*

10

*stolen firearm, may admit evidence about the inability of a felon to lawfully obtain a gun,*

*evidence of the high probability that any gun possessed by the felon is stolen, and an*

*officer's opinion that one possessing a stolen firearm flees and discards the firearm when*

*approached by a law enforcement officer?*

*Answer 1: Yes, as to testimony that the felon may not obtain a gun lawfully. No,*
*as to other testimony.*

To obtain a conviction for possession of a stolen firearm, the State must prove that

Bryan Crow knew the gun was stolen. RCW 9A.56.140, .310. The State need not

establish actual knowledge. *State v. Rockett*, 6 Wn. App. 399, 402, 493 P.2d 321 (1972).

The State need only prove knowledge of facts sufficient to place the accused on notice

that the property was stolen. *State v. Rockett*, 6 Wn. App. at 402. Crow contends that, in

meeting this burden, the prosecution introduced inadmissible "profile evidence" that

invaded the jury's province of finding guilt.

"Profile testimony" identifies a person as a member of a group more likely to

commit a crime. *State v. Avendano-Lopez*, 79 Wn. App. 706, 710, 904 P.2d 324 (1995);

*State v. Braham*, 67 Wn. App. 930, 936, 841 P.2d 785 (1992). Stated differently, profile

evidence suggests that a defendant possesses one or more behavioral characteristics

typically displayed by another person engaged in crime. *State v. Haskie*, 242 Ariz. 582,

585, 399 P.3d 657 (2017). With profile evidence, the State attempts in part to convict the

accused on evidence beyond the individual circumstances of the case and on one or more

11

traits the accused possesses in common with others who purportedly commit the same crime.

No evidence rule expressly addresses the admissibility or inadmissibility of profile testimony. As a result, one federal circuit directs trial courts to focus the inquiry not on defining and classifying evidence into categories of profile or nonprofile, but to examine the bounds of applicable rules of evidence. *United States v. McDonald*, 933 F.2d 1519, 1522 (10th Cir. 1991).

Bryan Crow identifies no evidence rule purportedly violated by the State's evidence that he challenges on appeal. Nevertheless, profile testimony implicates at least four rules. First, profile testimony may lack any relevance and thus breach ER 402. Second, such evidence, though relevant, may unduly prejudice the accused or confuse the jury and thus violate ER 403. Third, the evidence may constitute impermissible character evidence under ER 404(a) because the profile emphasizes a trait of the accused. Fourth, law enforcement officers typically present profile evidence to bolster a conclusion about the defendant when listing characteristics that, in the opinion of law enforcement officers, are typical of a person engaged in a specific illegal activity. *United States v. Robinson*, 978 F.2d 1554, 1563 (10th Cir. 1992). Since most profile testimony emanates from professional witnesses and may lack a scientific or other supportive basis, the evidence may constitute inadmissible expert testimony that conflicts with ER 702.

Some courts permit profile evidence under limited circumstances. For instance,

12

the government may present such evidence when the defendant contests the justification

for a police stop or arrest at a suppression or probable cause hearing.  *United States v.*

*Sokolow*, 490 U.S. 1, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989); *State v. Ketchner*, 236

Ariz. 262, 339 P.3d 645, 647 (2014).  Sometimes, the testimony is admitted purely for

background material, such as the modus operandi of a drug-trafficking organization.

*United States v. Hernandez-Cuartas*, 717 F.2d 552, 555 (11th Cir. 1983); *State v.*

*Gonzalez*, 229 Ariz. 550, 278 P.3d 328, 332 (Ct. App. 2012).

But presenting profile testimony as substantive evidence to convict at trial poses a

different question.  Courts condemn the use of profiles as substantive evidence of guilt.

*United States v. McDonald*, 933 F.2d 1521 (10th Cir. 1991*)*; *United States v. Beltran-*

*Rios*, 878 F.2d 1208, 1210 (9th Cir. 1989); *United States v. Hernandez-Cuartas*, 717 F.2d

at 555.

Profile evidence cannot be used as substantive proof of guilt because of the risk

that a defendant will be convicted not for what he did but for what others are doing.  *State*

*v. Escalante*, 245 Ariz. 135, 425 P.3d 1078, 1085-86 (2018).  Testimony of criminal

profiles is highly undesirable as substantive evidence because of its low probativity and

its inherent prejudice.  *United States v. Gillespie*, 852 F.2d 475, 480 (9th Cir. 1988).  The

major premise of profile evidence is faulty.  The evidence implies that criminals accused

of one particular crime, and only criminals, act in a given way.  In fact, certain behavior

may be consistent with both innocent and illegal behavior.

The court must leave the ultimate responsibility of linking a defendant's conduct with the typical characteristics of a criminal actor to the jurors. *United States v. Gonzalez-Rodriguez*, 621 F.3d 354, 364 (5th Cir. 2010). If the profile testimony itself makes that connection, the testimony crosses into the forbidden territory in which testimony with an "expert" imprimatur opines on the ultimate issue of guilt which is for the trier of fact alone. *United States v. Sosa*, 897 F.3d 615, 619 (5th Cir. 2018), *cert denied*, 139 S. Ct. 833 (2019). Even if law enforcement officers do not directly declare that the defendant fits a profile, the defendant still suffers undue prejudice if the officers testify that one who engages in certain criminal behavior possesses certain characteristics and the State through other testimony proves that the defendant possesses those characteristics. *United States v. Wells*, 879 F.3d 900, 920-21 (9th Cir. 2018) (decision involving forensic psychologist rather than law enforcement officer providing profile testimony).

Without identifying any evidentiary rule, Washington follows the prevailing view that generally precludes profile testimony because of its relative lack of probative value when compared to the danger of its unfair prejudice. *State v. Avendano-Lopez*, 79 Wn. App. at 710-11 (1995). Perpetrator profile testimony implies an opinion that the defendant is the sort of person who would engage in the alleged act, and, therefore, he committed the act in this case too. *State v. Braham*, 67 Wn. App. at 939 n.6 (1992).

Washington decisions present some examples of impermissible profile evidence.

14

In *State v. Steward*, 34 Wn. App. 221, 660 P.2d 278 (1983), a prosecution for the death of an infant, the court held as reversible error testimony from a pathologist that babysitting boyfriends of single mothers are most likely to be child abusers. In *State v. Maule*, 35 Wn. App. 287, 667 P.2d 96 (1983), the court also held as harmful error an expert's opinion that the majority of child sexual abuse cases involve a male parent figure.

In *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984), a State witness testified that in eighty-five to ninety percent of cases, the child is molested by someone he or she already knows. The Supreme Court directed that, on retrial, the evidence be excluded because the evidence invites the jury to conclude that, because of defendant's relationship to the victim, he is statistically more likely to have committed the crime.

Similarly, in *State v. Claflin*, 38 Wn. App. 847, 690 P.2d 1186 (1984), a prosecution for rape and indecent liberties, the State's witness testified that forty-three percent of child molestation cases were *reported* to have been committed by father figures. Considering the defendant's characterization at trial as the victims' surrogate father, the testimony was extremely prejudicial and should not have been admitted.

The introduction of profile testimony usually occurs in prosecutions for a sex or drug crime. We find no Washington case addressing the propriety of testimony about those found with guns or found with stolen property. We have found, however, helpful Arizona and California decisions.

In *People v. Martinez*, 10 Cal. App. 4th 1001, 12 Cal. Rptr. 2d 838 (1992), a jury

found Rolando Martinez guilty of possessing a stolen vehicle. The appeals court reversed the conviction because of introduction of profile evidence. Martinez claimed he did not know the car to be stolen. Nevertheless, when officers stopped Martinez, he drove a Toyota 4–Runner on Interstate 10 in southern California on the road to Guatemala. The car had a different license plate than the plate before the car's theft. Over Martinez's objection, the trial court allowed two California Highway Patrol officers to testify. One officer declared that the Toyota 4–Runner fit the profile of the type of vehicles stolen from southern California and driven to Central America. The almost exclusive route used by those persons moving vehicles to Central America was Interstate 10 through El Paso, Texas and down through Mexico. The officer also stated that more than half of the investigations he has been involved in have been "cold-plated," which means the license plates on the stolen vehicle do not reflect a stolen vehicle. Another officer testified that the bulk of stolen vehicles went to Guatemala and El Salvador. He added that Toyota 4–by–4 pickups, Toyota 4–Runners, Nissan pickups, Nissan Pathfinders, and Isuzus are targeted for thefts because they can be hot-wired and the vehicles are ideal for the terrain in Central America. Over half the people that he personally interviewed had a false certificate of title with the same number, 1468770, found on the certificate of title carried by Martinez. The court wrote that every defendant has a right to be tried based on the evidence against him or her, not on the techniques utilized by law enforcement officers in investigating criminal activity. Even though the State contended the officer's testimony

16

did not constitute "profile" evidence, the thrust of the evidence sought to establish that

Martinez "fit" a certain "profile." *People v. Martinez*, 10 Cal. App. 4th at 1002.

In *State v. Cifuentes*, 171 Ariz. 257, 830 P.2d 469 (Ct. App. 1991), law

enforcement apprehended Jorge Cifuentes driving through the international border at

Douglas, Arizona, in a stolen 1989 Isuzu. Cifuentes claimed to have purchased the

vehicle from an unknown man in Los Angeles. Over objection, the prosecution offered

as an expert a Los Angeles police detective, John Toland, who testified of car theft rings

in Los Angeles organized along ethnic lines, including Guatemalan ethnicity. The

Guatemalan ring, he testified, tended to steal Japanese four-wheel drive vehicles, to use

forged registrations, and to travel in small groups approaching the Mexican border.

Because Cifuentes was Guatemalan and his possession of the Isuzu matched the profile

developed by Toland, the jury, according to the reviewing court, was invited to infer that

defendant knew his Isuzu was stolen because he was part of a Guatemalan car theft ring.

The Arizona Court of Appeals reversed the conviction.

To analyze whether the State's evidence against Bryan Crow constituted

impermissible profile testimony, we list and categorize the comments uttered by Yakima

police officers during trial. Some comments overlap in substance with other comments.

In referring to a felon disqualified to own or possess a firearm, the State labels such

person a "prohibited person." We refer to such person, including Bryan Crow, as a

"disqualified person." Presumably Crow contends the State tried to convict him by

17

conjoining him into a class of disqualified persons.

The evidentiary categories are:

1. No one could lawfully sell, gift, or transfer a gun to Bryan Crow.

2. Bryan Crow could not have lawfully obtained a firearm because a background check would have established Crow to be disallowed to possess a gun.

3. A disqualified person will obtain a firearm by stealing it or buying it unlawfully on the street.

4. Illegally obtained firearms are typically stolen during burglaries and vehicle prowls.

5. A person who knows he possesses a stolen firearm commonly discards the gun and flees when approached by a law enforcement officer.

6. The majority of disqualified people apprehended with a firearm have a stolen firearm.

7. Most or a high percentage of firearms in the hands of a disqualified person are stolen firearms.

We hold that the statements in categories one and two do not constitute inadmissible evidence. One might argue that the State attempted to lump Bryan Crow into a category of people unable to legally possess a gun. Nevertheless, the statement focuses on Bryan Crow, not people like Bryan Crow. The comment is a straightforward statement that Bryan Crow could not legally purchase a gun. Crow essentially admitted

18

this legal fact when he stipulated to a felony that disqualified him from ownership or possession of a gun. Comments in category two merely reiterated the contents of category one.

We hold the remaining categories of Yakima police officer testimony to be inadmissible. The testimony sought to convict Bryan Crow of a crime based on what others do. Category three told jurors that most, if not all, disqualified persons obtain a firearm by stealing the gun or buying it unlawfully on the street. This testimony informs the jury that, because Crow falls into the profile of a disqualified person, he likely stole the gun or purchased it unlawfully on the street such that he should have known the gun was stolen.

Category four states the obvious that illegally obtained firearms are typically stolen during burglaries and vehicle prowls. We suppose the only other way to steal a gun would be to grab a gun in the outdoors. The evidence probably has no relevance to charges against Bryan Crow and any relevance would be unduly prejudicial.

Categories five, six, and seven also attempt to convict Bryan Crow based on characteristics of him in common with others. The State needed to prove that Crow knew the Ruger handgun to be stolen. The State presented testimony that, when accosted, Crow fled and threw his gun to the ground. The State linked this behavior of Crow with the testimony that a person who knows he possesses a stolen firearm commonly discards the gun and flees when approached by a law enforcement officer.

19

The State presented testimony that, when Officer Chris Taylor told Bryan Crow that the latter was under arrest, Crow possessed a gun. The State then linked this evidence with expert police officer testimony that the majority of disqualified persons apprehended with a firearm have a stolen firearm. The State also linked the behavior of Crow with expert opinion that most or a high percentage of firearms in the hands of a disqualified person are stolen firearms. In short, the State, in part, sought to convict Bryan Crow by comparing him to other guilty people.

The Yakima Police Department officers answered questions in the context of their knowledge based on "training and experience." Thus, the State used the imprimatur of expertise and law enforcement to group Bryan Crow with other guilty persons. *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007).

The State did not limit testimony about felons possessing stolen guns simply for background. The State employed the evidence as substantive evidence to convict Bryan Crow. During closing, the prosecution emphasized that "these guys" get guns in the manner that John Carnevali's Ruger gun was taken from his car. RP at 310. The jury likely employed the testimony to convict Bryan Crow.

We recognize that *State v. Avendano-Lopez*, 79 Wn. App. 706 (1995) presents an alternative outcome. In a prosecution for possession of cocaine with intent to deliver, a law enforcement officer testified about characteristics or behavior of a typical drug dealer. He declared that a drug dealer usually receives money from users, often carries

20

substantial sums of money and narcotics on his or her person, often keeps drugs in his or her mouth, and often abuses drugs. On appeal, Ignacio Avendano-Lopez asserted that the introduction of this testimony required reversal because its prejudicial effect outweighed any probative value. This court refused to characterize the officer's testimony as "criminal profile" testimony. According to this court, the officer's testimony did not identify any group as being more likely to commit drug offenses. Rather, the evidence explained the arcane world of drug dealing and drug transactions and assisted the trier of fact in understanding the evidence.

We question the reasoning in *Avendano-Lopez*. The law enforcement officer's testimony implied that someone who receives money from a user and who holds large sums of cash also sold and delivered drugs. The State presented the officer's testimony because some of the officer's testimony fit evidence presented as to Avendano-Lopez's behavior during the time of the charged crime. The State should not be free to present profile testimony in the guise of background evidence.

*Issue 2: Whether Bryan Crow "opened the door" for admission of profile evidence?*

*Answer 2: Yes, as to a disqualified person obtaining a firearm by stealing the gun or buying the gun illegally. No, as to the remainder of profile testimony provided by law enforcement officers.*

We must now address whether Bryan Crow opened the door or waived any

21

objection to impermissible testimony about the characteristics of one who knowingly possesses a stolen firearm. We repeat Crow's counsel's questioning of Officer Chris Taylor:

> [Defense Counsel]: You testified about the firearm that was recovered. The serial numbers, and I understand from your testimony, the serial numbers weren't ground off?
> TAYLOR: Correct.
> [Defense Counsel]: How is—how is someone supposed to know if a gun is stolen or not?
> TAYLOR: There's two ways. Obviously, the direct knowledge would be if they stole it, but a lot of times the way that I found people that know the firearm was stolen that they buy it illegally. If they buy it on the street from somebody who's not a legitimate gun salesman, buy it for a cheap price, most of the people that I come into contact with stolen firearms will say they bought it from somebody for fifty bucks, a hundred bucks. They assume that it's stolen based on the fact that it's not a legitimate gun sale and they're buying it so cheap.

RP at 198-99. Essentially Officer Taylor testified that someone will know if the gun he possesses is stolen if the person stole the gun, purchases the gun illegally, purchases the gun from someone who is not a licensed gun dealer, or purchases the gun for a cheap price.

We repeat the testimony we previously ruled inadmissible:

1. A disqualified person will obtain a firearm by stealing it or buying it unlawfully on the street.

2. Illegally obtained firearms are typically stolen during burglaries and vehicle prowls.

22

3.  A person who knows he possesses a stolen firearm commonly discards the gun and flees when approached by a law enforcement officer.

4.  The majority of disqualified people apprehended with a firearm have a stolen firearm.

5.  Most or a high percentage of firearms in the hands of a disqualified person are stolen firearms.

We observe that category one helps to answer defense counsel's question: how will one know that the handgun he possesses is stolen? Category one answers that one will know if the firearm is stolen if he steals the gun himself or purchases the gun illegally. Categories two through three do not respond to defense counsel's question. Category two explains the manner in which illegally obtained guns are stolen. Category three describes how a person acts if he knows he possesses a stolen gun, not how the person will know that he possesses a pilfered firearm. Categories four and five present percentages of disqualified people with stolen handguns and stolen firearms in the hands of disqualified people. The information in the last two categories explains that guns in the possession of most disqualified persons are stolen firearms but does nothing to clarify if a disqualified person knows the firearm to be stolen.

Generally, once a party has raised a material issue, the opposing party is permitted to explain, clarify, or contradict the evidence. *State v. Wafford*, 199 Wn. App. 32, 37, 397 P.3d 926 (2017). When a party opens up a subject of inquiry, that party

23

contemplates that the rules will permit cross-examination or redirect examination within the scope of the examination of that subject. *State v. Gefeller*, 76 Wn.2d 449, 455, 458 P.2d 17 (1969). Otherwise, to close the door after receiving only a part of the evidence leaves the matter suspended in air at a point markedly advantageous to the party who opened the door and might limit the proof to half-truths. *State v. Gefeller*, 76 Wn.2d at 455.

Other appellate decisions on opening the door help with regard to providing general principles, but rarely will the court find a decision directly on point. Each case must depend on the case's factual background and the specific questions that allegedly open the door for the opposition to ask questions soliciting otherwise inadmissible testimony.

A party's waiver of inadmissible evidence has limitations. The rebutting testimony must explain, clarify, or contradict the first party's evidence. *State v. Jones*, 144 Wn. App. 284, 298, 183 P.3d 307 (2008); *State v. Avendano-Lopez*, 79 Wn. App. at 714 (1995). In *State v. Fisher*, 165 Wn.2d 727, 202 P.3d 937 (2009), our high court reversed a conviction when the State, in a prosecution for sexual molestation of a child, offered evidence of the accused's later physical abuse of children. The Supreme Court considered physical abuse and sexual molestation as distinct acts.

We note that defense counsel inquired of Officer Chris Taylor about how an accused should know if he possesses a stolen firearm after Taylor already testified that no one could lawfully sell, gift, or transfer a gun to Bryan Crow. Nevertheless, we previously ruled this earlier testimony to be admissible. Also, Crow does not contend that his trial counsel asked Officer Taylor about knowledge of a stolen gun only because the prosecution previously asked Taylor certain questions.

We hold that Bryan Crow waived his right to challenge testimony from law enforcement officers that a disqualified person will obtain a firearm by stealing it or buying it unlawfully on the street. Such testimony helped to explain how a disqualified person knows his possessed firearm to be stolen. We hold that Bryan Crow did not open the door to the further testimony of the law enforcement officers. The additional testimony about conduct of persons possessing a gun and percentages of stolen guns on disqualified persons clarified nothing with regard to a person's knowledge of the status of a firearm and thus remained inadmissible profile evidence.

*Issue 3: Whether trial defense counsel performed ineffectively when failing to object to profile testimony?*

*Answer 3: Yes.*

Bryan Crow argues that his attorney afforded ineffective assistance by failing to object to the improper profile testimony that the State employed to imply Crow's guilt. We agree.

Asserting ineffective assistance of counsel on appeal frustrates the judicial process since the appellate court indirectly reviews an issue not brought to the attention of the trial court. The State may need to incur the cost of a second trial through no fault of its own. Nevertheless, the accused's right to competent counsel preempts efficiency of the judicial system. Guilt or innocence should not depend on the performance of the defendant's trial attorney. The constitution guarantees effective assistance of counsel in order to ensure that a defendant receives due process, because counsel helps ensure that the defendant presents a defense that furthers a fundamentally fair trial. *State v. Loher*, 140 Haw. 205, 398 P.3d 794, 813 (2017).

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). State decisions follow the teachings and rules announced in the United States Supreme Court's seminal decision of *Strickland v. Washington*, 466 U.S. 668 (1984). An accused is entitled to more than a lawyer who sits next to him in court proceedings. In order to effectuate the purpose behind the constitutional protection, the accused is entitled to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. at 686.

A claim of ineffective assistance of counsel requires a showing that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant.

26

*Strickland v. Washington*, 466 U.S. 687. If one prong of the test fails, we need not address the remaining prong. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). We address the first prong first.

For the deficiency prong of ineffective assistance of counsel, this court gives great deference to trial counsel's performance and begins the analysis with a strong presumption that counsel was effective. *State v. West*, 185 Wn. App. 625, 638, 344 P.3d 1233 (2015). Deficient performance is performance that fell below an objective standard of reasonableness based on consideration of all the circumstances. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). The appellant bears the burden to prove ineffective assistance of counsel. *State v. McFarland*, 127 Wn.2d at 335.

Courts cannot exhaustively define the obligations of counsel or form a checklist for judicial evaluation of attorney performance. *Strickland v. Washington*, 466 U.S. 668 (1984). Nevertheless, effective representation entails certain basic duties, such as the overarching duty to advocate the defendant's cause and the more particular duty to assert such skill and knowledge as will render the trial a reliable adversarial testing process. *Strickland v. Washington*, 466 U.S. 668; *In re Personal Restraint of Yung-Chen Tsai*, 183 Wn.2d 91, 100, 351 P.3d 138 (2015).

The State astutely relies on the principle that trial strategy and tactics cannot form the basis of a finding of deficient performance. *State v. Johnston*, 143 Wn. App. 1, 16, 177 P.3d 1127 (2007). The defendant must show in the record the absence of a legitimate

27

strategic or tactical reason supporting the challenged conduct or omission by counsel.

*State v. McFarland*, 127 Wn.2d at 336. Imposing the burden on the defendant invents

problems since the imposition requires the defendant to prove a negative. Presumably the

defendant must fashion straw men or women and then dissemble them. In practice, the

State typically posits one or more reasons for a tactical decision. The Washington

Supreme Court nonetheless remains firm that no presumption of ineffective

representation exists. *State v. McFarland*, 127 Wn.2d at 336. Thus, in the end, the

defendant holds the burden of showing a lack of a legitimate strategy.

Decisions on whether and when to object to trial testimony are classic examples of

trial tactics. *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). Only in

egregious circumstances, on testimony central to the State's case, will the failure to

object constitute incompetence of counsel justifying reversal. *State v. Johnston*, 143 Wn.

App. at 19 (2007). Counsel engages in a legitimate trial tactic when foregoing an

objection in circumstances when counsel wishes to avoid highlighting certain evidence.

*In re Personal Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004). When a

defendant bases his ineffective assistance of counsel claim on trial counsel's failure to

object, the defendant must show that the objection would likely have succeeded. *State v.

Gerdts*, 136 Wn. App. 720, 727, 150 P.3d 627 (2007). We have already concluded that

the trial court should have sustained an objection to the profile testimony.

28

Conversely, counsel performs deficiently by failing to object to inadmissible evidence absent a valid strategic reason. *State v. Saunders*, 91 Wn. App. 575, 578, 958 P.2d 364 (1998). Reversal is required if an objection would likely have been sustained and the result of the trial would have been different without the inadmissible evidence. *State v. Saunders*, 91 Wn. App. at 578.

The State in Bryan Crow's appeal posits that trial defense counsel chose a strategy of arguing that the State lacked proof that Crow knew the 9mm Ruger to be stolen. According to the State, counsel asked Officer Chris Taylor about how Crow should know the firearm to be stolen and did not object to the State's questioning of Taylor and other officers about percentages and characteristics of those possessing stolen guns in order to emphasize the lack of State's evidence to prove Crow's lack of knowledge.

This court routinely affirms criminal convictions against a claim of ineffective assistance of counsel on the basis that the claimed ineffective assistance involved trial strategy. Nevertheless, an argument that trial strategy informed trial counsel's performance does not end our inquiry. Not all defense counsel's strategies or tactics are immune from attack. *In re Personal Restraint of Caldellis*, 187 Wn.2d 127, 141, 385 P.3d 135 (2016). A criminal defendant can rebut the presumption of reasonable performance by demonstrating that no conceivable legitimate tactic explains counsel's performance. *In re Personal Restraint of Caldellis*, 187 Wn.2d at 141; *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). The relevant question is not

whether counsel's choices were strategic, but whether they were reasonable. *Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000); *State v. Grier*, 171 Wn.2d at 34 (2011).

We cannot be sure if trial defense counsel purposely failed to object to profile testimony as part of a trial strategy. We can assume that trial counsel purposely questioned Officer Chris Taylor about how one should know a gun to be stolen since the question involved affirmative conduct.

We disagree with the State and conclude that no reasonable trial strategy explains defense counsel's failure to object to profile evidence. The State's explanation falls short. Trial defense counsel could argue to the jury the lack of evidence to prove Bryan Crow's knowledge without the profile evidence. Trial counsel could have more effectively argued the lack of knowledge without the State's profile testimony, particularly since Crow closely fit the profile. Allowing the State to present testimony of why Crow should know of the gun being stolen does not illustrate for the jury the lack of evidence to prove knowledge. The officers' testimony did nothing to emphasize the lack of proof, but instead presented additional proof that Crow should have known the gun to be stolen. Because the evidence was inadmissible, defense counsel unreasonably failed to object.

Bryan Crow does not argue on appeal that his trial counsel performed ineffectively by asking Officer Chris Taylor how one should know a firearm to be stolen.

Nevertheless, this question ties closely to the failure to object to profile testimony. Competency of counsel is determined based on the entire record below. *State v. McFarland*, 127 Wn.2d at 335 (1995). Counsel's question to Taylor served no legitimate purpose in the defense of Crow. Instead, the answer to the question allowed the jury to convict Crow solely on the basis of his fitting a profile. Crow's counsel could have more effectively argued the lack of knowledge without an officer's expert inadmissible opinion as to reasons why one should conclude a gun to be stolen.

The State writes in its appeal brief that

> It is easy to see why a trial attorney would let the 'speculation' regarding all felons possess stolen weapons in; it makes the fact that there was no actual proof that Crow knew the gun that he had in his possession was stolen much more apparent.

Br. of Resp't at 14 (emphasis omitted). Nevertheless, the law enforcement officers never suggested that their opinions represented "speculation." The State never told the jury that the profile evidence constituted "speculation." The State presented the evidence as uncontradicted evidence of the guilt of Bryan Crow. The evidence confirmed guilt, not the absence of proof of guilt.

*Issue 4: Whether trial defense counsel's deficient performance prejudiced Bryan Crow?*

*Answer 4: Yes.*

We also conclude that trial counsel's ineffectiveness prejudiced Bryan Crow.

31

Under *Strickland*, the defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. at 669 (1984).

The nature of the evidence alone without further analysis compels a conclusion that the law enforcement officers' testimony prejudiced Bryan Crow. Profile testimony is inadmissible because it lacks probative value and is unduly prejudicial. *State v. Braham*, 67 Wn. App. at 939 (1992). As already noted, Washington courts have repeatedly reversed convictions because of the admission of profile evidence because of the harmful nature of the evidence. *State v. Petrich*, 101 Wn.2d 566 (1984); *State v. Claflin*, 38 Wn. App. 847 (1984); *State v. Maule*, 35 Wn. App. 287 (1983); *State v. Steward*, 34 Wn. App. 221 (1983).

The State's own arguments on appeal illustrate the harmful nature of the profile evidence. Throughout its brief, the State emphasizes the importance of the profile testimony in convicting Bryan Crow. For example, the State writes in its appeal brief that:

> The questions in this trial, once again, were necessary so that they [sic] jury would have an understanding of how the defendant would know that what he had in his hand was a stolen item. There was no confession, no statements, no ground off serial numbers, etc.

Br. of Resp't at page 11. The State emphasized the profile testimony in closing argument

when referring to "these guys" and including Crow as one of these guys who, as statistics show, should know he possessed a stolen gun and who fled and discarded the gun when approached by a law enforcement officer. The State could have limited its argument to the conduct of Crow without classifying him as one of "these guys."

*Issue 5: Whether the sentencing court committed error when calculating Bryan Crow's offender score without documentary evidence of Crow's earlier convictions?*

*Answer 5: Yes.*

On appeal, Bryan Crow also challenges his sentence as the product of an offender score not supported by documentary evidence. He asserts that the State presented no evidence at the sentencing hearing to prove that he had prior felony convictions and therefore the trial court erred in finding an offender score of four. Since the trial court will need to resentence Crow regardless of whether the State retries the charge of possession of a stolen firearm and this issue may arise on resentencing, we address this assignment of error. We agree with Crow.

A sentencing court's calculation of an offender score is reviewed de novo. *State v. Tewee*, 176 Wn. App. 964, 967, 309 P.3d 791 (2013). Established case law holds that illegal or erroneous sentences may be challenged for the first time on appeal in regard to sentencing decisions. *State v. Ford*, 137 Wn.2d 472, 477, 973 P.2d 452 (1999).

Before imposing a sentence on a convicted defendant, the trial court must conduct a sentencing hearing. RCW 9.94A.500(1); *State v. Hunley*, 175 Wn.2d 901, 908, 287

33

P.3d 584 (2012). A defendant's criminal history or offender score affects the sentencing range and is calculated by adding the defendant's current offenses and prior convictions together. RCW 9.94A.589(1)(a); *State v. Hunley*, 175 Wn.2d at 908-09. To determine the proper offender score, due process permits the court to "rely on no more information than is admitted by the plea agreement, or admitted, acknowledged, or proved in a trial or at the time of sentencing." *State v. Hunley*, 175 Wn.2d at 909. The State has the burden to prove prior convictions at sentencing by a preponderance of the evidence. *State v. Hunley*, 175 Wn.2d at 909-10. The best evidence of a prior conviction is a certified copy of the judgment. *State v. Lopez*, 147 Wn.2d 515, 519, 55 P.3d 609 (2002), *abrogated in part by In re Personal Restraint of Adolph*, 170 Wn.2d 556, 243 P.3d 540 (2010). Bare assertions, unsupported by evidence, do not satisfy the State's burden to prove the existence of a prior conviction. *State v. Hunley*, 175 Wn.2d at 910.

Our state Supreme Court has vacated sentences on multiple occasions due to the State's failure to provide sufficient evidence of prior convictions. *State v. Mendoza*, 165 Wn.2d 913, 928-29, 205 P.3d 113 (2009); *State v. Lopez*, 147 Wn.2d at 523; *State v. Ford*, 137 Wn.2d at 482. *Ford* is the seminal case that establishes the principles for an analysis as to whether the State has failed to provide sufficient evidence of prior convictions. In *Ford*, the State orally summarized the defendant's prior convictions, and the trial court counted the convictions toward the defendant's offender score. The court reasoned that no evidence was introduced to support the offenses because "a prosecutor's

assertions are neither fact nor evidence, but merely argument." *State v. Ford*, 137 Wn.2d at 483 n.3. Thus, the court held that the State failed to meet the preponderance of the evidence standard and the lack of evidence fell "below even the minimum requirements of due process." *State v. Ford*, 137 Wn.2d at 481.

In *State v. Mendoza*, 165 Wn.2d 913, 205 P.3d 113 (2009), the sentencing court relied on a filed statement from the prosecutor that included a list asserting the defendant's criminal history. The statement listed the date of the crime and sentencing court but did not include any other documentation to verify the convictions. The defendant did not object to the criminal history presented at the sentencing. The court held that the defendant's failure to object to the prosecutor's statement of criminal history did not constitute an acknowledgment of that history.

The court, in *State v. Hunley*, 175 Wn.2d 901 (2012), acknowledged that *Mendoza* involved a set of facts nearly identical to the facts before it. The State established Monte Hunley's alleged prior convictions solely on the prosecutor's summary assertion of the offenses. Nevertheless, the State failed to present any evidence documenting the alleged convictions and the defendant never affirmatively acknowledged the State's assertions regarding his criminal history. Because of the absence of a certified judgment and sentence or other document of record to prove the convictions, the *Hunley* court affirmed the Court of Appeals' remedy to remand for resentencing to require the State to prove Hunley's prior convictions unless affirmatively acknowledged.

At Bryan Crow's sentencing, the State did not provide any document of record to show that Crow had been convicted of three prior adult felonies and one prior juvenile felony. For purposes of the unlawful possession of a firearm charge, Crow stipulated to a prior serious offense so that the State would not be able to provide the details of his second degree assault conviction and thereby impact the jury's view of him. Other than Crow's stipulation, the prosecutor did not provide evidence of Crow's prior convictions.

Because the State did not provide the trial court with any document of record to prove Bryan Crow's prior convictions, Crow maintains that, other than the assault conviction to which he stipulated, the State failed to present evidence regarding other convictions. Based on *State v. Hunley* and *State v. Mendoza*, we agree. Crow never affirmatively acknowledged the State's assertions regarding his criminal history.

The State also argues that resentencing is not necessary because the trial court would impose the same sentence on Bryan Crow during remand. The State relies on *State v. Perez*, 69 Wn. App. 133, 847 P.2d 532 (1993) for this contention. We find *Perez* unpersuasive as that case involved issues relating to exceptional sentences. Instead, *State v. Ford*, *State v. Hunley*, and *State v. Mendoza* control this appeal.

CONCLUSION

We vacate Bryan Crow's conviction for possession of a stolen firearm and grant him a new trial on this charge. Regardless, we remand for another sentencing, wherein the State must present sufficient proof of earlier convictions for purposes of calculating

No. 35316-8-III
*State v. Crow*

Crow's offender score.

_____
Fearing, J.

I CONCUR:

Lawrence-Berrey, C.J.

37

No. 35316-8-III

KORSMO, J. (dissenting) — Mr. Crow failed to challenge the alleged "profile" evidence at trial and does not now get to raise that claim on appeal. In addition, after wrongly reversing a conviction, the majority addresses a sentencing claim that it need not hear due to the reversal. Accordingly, I dissent.

There are at least three things wrong with the majority's analysis of the evidentiary issue. First, the failure to object waived this challenge on appeal. Second, the majority has failed to establish that this case involves profile evidence. Third, the majority fails to correctly apply ineffective assistance analysis to that alleged profile evidence.

*Waiver.* It is well settled that objections to evidentiary rulings must be raised at trial so that the trial judge has the opportunity to correct a mistake. *State v. Guloy*, 104 Wn.2d 412, 421-22, 705 P.2d 1182 (1985). As a corollary of that doctrine, a party is limited on appeal to arguing only the specific objections that were raised to the trial court. *Id.* at 422. RAP 2.5(a) states that same general rule on appeal—issues and arguments that were not presented at trial will not be considered on appeal. Our past cases have stressed the particular importance of objecting in this very context. As then-judge Wiggins wrote:

No. 35316-8-III
*State v. Crow*

> 'Profile' testimony and permissible expert opinion overlap, which underscores the necessity of objecting to questionable testimony during trial so that the trial court can limit any objectionable 'profile' aspect and channel the testimony toward admissible expert opinion instead.

*State v. Avendano-Lopez*, 79 Wn. App. 706, 711, 904 P.2d 324 (1995), *review denied*, 129 Wn.2d 1007 (1996).[1]

Washington maintains an exception to these prohibitions for instances of "manifest constitutional error." RAP 2.5(a)(3). However, violations of evidentiary rules do not present instances of constitutional error. *Dowling v. United States*, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990) (ER 404(b)). Washington treats profile evidence as improper because it violates ER 403. *State v. Braham*, 67 Wn. App. 930, 935, 841 P.2d 785 (1992). Moreover, any error here, even if constitutional in nature, simply was not "manifest." As *Avendano-Lopez* recognizes, "profile" evidence overlaps with "permissible expert opinion." It is not manifestly clear that the now-challenged testimony even presents an issue of profile evidence as opposed to expert testimony.

Appellant presents an argument that is nothing more than a run-of-the-mill evidentiary challenge. It was waived by the failure to raise it at trial. *Guloy*, 104 Wn.2d at 421.

---

[1] This viewpoint is also supported by the out-of-state authorities relied on by the majority; in those cases, too, the defense preserved the issue by properly objecting at trial.

2

*Profile Evidence.* Although some of the belatedly-challenged testimony could have been possibly interpreted in a manner that turned it into profile evidence—and thus could easily have been cured by an objection—none of this testimony is clearly "profile" evidence. There was no basis for excluding it.

Washington defines profile evidence as that which identifies a particular group statistically known for committing some type of offense and then ties the defendant to that group. *E.g., State v. Petrich*, 101 Wn.2d 566, 576, 683 P.2d 173 (1984) (testimony that in 85-90 percent of the cases, child is molested by someone they know is objectionable); *State v. Maule*, 35 Wn. App. 287, 293, 667 P.2d 96 (1983) (testimony that "majority" of child abuse is committed by "male parent-figure" irrelevant and prejudicial). In most instances, this evidence is more prejudicial than probative. *Petrich*, 101 Wn.2d at 576; *Braham*, 67 Wn. App. at 936. However, there is no categorical ban on profile evidence. *Petrich*, 101 Wn.2d at 575-76; *Braham*, 67 Wn. App. at 939. Weighing the probative value of the evidence versus its prejudicial effect is always going to be a case-specific factual determination. There is no basis for imposing an appellate ban on all "profile" evidence, particularly where there was no challenge in the trial court and, hence, no balancing undertaken.

The majority's interpretation of the evidence as "profile" is unduly strained. No evidence was presented that Mr. Crow was a member of a group that probably or always

3

possesses stolen guns, nor was proof of such a necessary feature of the State's cases. The evidence presented simply did not constitute a "profile."

Here, the State had to prove that Mr. Crow "knew" the gun he carried was stolen, and had to do so in a circumstantial manner. Even after eliminating the possibility that Mr. Crow could lawfully own or possess the weapon, it still needed to contest his claim that he lawfully bought the weapon on the street. Hence, the characteristics of the stolen gun market were necessarily probative evidence. Evidence concerning the nature of these back-alley transactions was significantly probative. If there had been a challenge, the trial court easily could have, and probably would have, admitted the evidence.

Moreover, the evidence was not unduly prejudicial to Mr. Crow. The jury already knew that he was a convicted felon who could not lawfully possess guns and that there was no lawful way for him to acquire them. Evidence that he unlawfully possessed the stolen gun in question was properly before the jury, as was the fact that the gun had been stolen in Seattle. The alleged profile evidence did little to additionally, and unduly, prejudice Mr. Crow in light of the prejudicial evidence already before the jury.[2]

---

[2] The majority misreads the prosecutor's comment about "these guys" in rebuttal argument. In context, it is very clear that the prosecutor is talking about how guns are stolen and put into the market. Report of Proceedings at 310 ("These guns are stolen. That's how these guys are getting them.") The prosecutor did not call Mr. Crow a gun thief nor suggest he was a player in the stolen weapon market, but simply emphasized that the black market in weapons consists exclusively of stolen guns.

The majority's analysis would better fit the profile category if Mr. Crow had been charged with theft of the gun. In that circumstance, inferring theft from the fact of possession would be a clearer example of a profiling. But here, instead, it was the knowledge element of the possession of a stolen firearm statute that was at issue, not the identity of the thief. Explaining to jurors how those weapons typically were acquired, in the absence of lawful means, was probative evidence.

If an objection had been made at trial, it likely would have been overruled. Since Mr. Crow does not get to try his case in this court, his waiver in the trial court should preclude our review of it here.

*Ineffective Assistance.* To avoid these problems of waiver and the fact that this was not profile evidence, the majority contends that trial counsel was ineffective for not objecting. Given that he had no reason to know of, let alone rely on, the foreign authorities that the majority considers, it simply cannot be said that counsel was ineffective. Moreover, counsel made good use of the evidence in closing argument. There was neither prejudice nor error.

Of course, Mr. Crow needs to establish both. Courts must evaluate counsel's performance using a two-prong test that requires determination whether or not (1) counsel's performance failed to meet a standard of reasonableness and (2) actual prejudice resulted from counsel's failures. *Strickland v. Washington*, 466 U.S. 668, 690-92, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Review is highly deferential and we engage in the

5

presumption that counsel was competent; moreover, counsel's strategic or tactical choices are not a basis for finding error. *Id.* at 689-91. Thus, an attorney's failure to perform up to the standards of the profession will require a new trial when the client has been prejudiced by counsel's failure. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

Counsel did not err by not objecting to the officers' testimony. First, this wasn't true profile evidence, nor was it used in such a manner. Second, counsel clearly was acting strategically—he solicited some of that evidence himself and relied on the weakness of the State's case to contend in closing argument on count 2 that the State had no evidence to show his client knew the weapon was stolen. Report of Proceedings at 306-07. Third, the majority fails to provide any authority for the proposition that counsel was ineffective for failing to cite out-of-state authorities as a basis for exclusion of evidence. *In re Pers. Restraint of Theders*, 130 Wn. App. 422, 430-35, 123 P.3d 489 (2005) (appellate attorney not ineffective for failing to argue theory of hearsay and confrontation supported by one federal circuit court). On this record, Mr. Crow simply does not show that his counsel erred.

He also fails to show that he was prejudiced by the alleged error. Having made use of this evidence, Mr. Crow cannot argue that it was prejudicial. *Avendano-Lopez*, 79 Wn. App. at 711. He had no true defense to the charge—and the State had an entirely circumstantial case on the knowledge element—so it only made sense to highlight the

6

No. 35316-8-III
*State v. Crow*

weakness of the State's case to attack the prosecutor's contention that Crow knew the weapon was stolen. This was a reasonable defense to raise in a weak case.

Mr. Crow needed to establish that his counsel acted deficiently and that he was prejudiced thereby. He did not succeed in either task. For all of these reasons, the belated challenge to the evidence on appeal is utterly without merit.

*Sentencing.* Having reversed the conviction in count 2, an action that it acknowledges will require resentencing regardless of the outcome of any retrial, the majority needlessly discusses and reverses the sentence for a different reason—alleged failure to prove the prior convictions. I don't think there was any error since the parties and the judge obviously knew about and discussed—before trial and on two[3] occasions after trial—the prior history. The prior history simply was not at issue and that explains why it was not a contested matter at trial.[4]

Defense counsel acknowledged the offender score by arguing for sentences within the range calculated by the prosecutor. The general principle at work is that while a defendant cannot agree to a legally incorrect offender score, he can agree or waive factual or discretionary challenges to an offender score. *E.g., In re Pers. Restraint of Goodwin,*

---

[3] The prior history was discussed at a hearing the week before sentencing due to the filing of new charges and discussion of a universal plea agreement. RP at 329-34.

[4] A trial judge should always confirm at the beginning of a sentencing hearing that there is no dispute about criminal history. In addition to settling any dispute prior to imposing sentence, it may serve to avoid a needless remand over an issue that doesn't exist.

7

No. 35316-8-III
*State v. Crow*

146 Wn.2d 861, 874-75, 50 P.3d 618 (2002). The existence and effect of Mr. Crow's criminal history was simply not at issue in this case and he waived any formal proof of his prior offenses.

For all of the noted reasons, there was no error here. I dissent.

_____
Korsmo, J.

8