# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56439-4-II |
| Respondent, | |
| v. | |
| MICKEY S. PINE, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, C.J.— Mickey Pine's truck drifted across the center line of a two lane road in Pacific County, striking an oncoming car and killing the other driver. The State charged Pine with vehicular homicide, which required the State to prove that Pine was under the influence of alcohol or drugs, driving recklessly, or driving with substantial disregard for the safety of others.

Before trial, Pine moved to suppress a blood alcohol concentration test performed after his arrest, but counsel did not make a *Franks v. Delaware*[1] challenge to the warrant for the blood draw. A jury convicted Pine of vehicular homicide.

Pine appeals. He argues that defense counsel provided ineffective assistance by not making a *Franks* challenge to the warrant for the blood draw, and through decisions to elicit or not object to certain testimony at trial. Pine also asserts that the trial court abused its discretion by admitting a trooper's observation about Pine's eye movements and by admitting expert testimony about airbag control module data from Pine's truck. Pine further contends that the prosecutor committed

---

[1] 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

misconduct by asking Pine why his accident reconstruction expert did not testify. Finally, Pine asserts that cumulative errors denied him a fair trial.

We affirm.

FACTS

I. THE COLLISION

In March 2019, Pine drank three White Russians at a bar, then left to drive home when the bar closed around 1:30 a.m. Near 2:00 a.m., Pine was driving eastbound on a dry, straight, relatively flat stretch of two-lane highway when his truck crossed over the double yellow lines and struck Shawn Clearwater's car, which was traveling west.

The collision gouged the pavement in the westbound lane at the point of impact and did significant damage to Clearwater's car. Clearwater died at the scene. Pine was not seriously injured.

Pine refused to participate in field sobriety tests, so Trooper Kelly Swanson sought a warrant for a blood draw to determine Pine's blood alcohol concentration.[2] In a declaration, Swanson explained that Clearwater had died and that "[p]reliminary investigation of the collision scene indicate[d] Pine's vehicle crossed the centerline and struck the oncoming vehicle." Clerk's Papers (CP) at 69. Swanson stated that she "detected an obvious odor of intoxicants emanating from [Pine's] person and noted he had bloodshot, watery eyes." CP at 70. And Pine told another officer that "he'd consumed three beers." *Id.* A commissioner granted the warrant.

---

[2] Swanson changed her surname before trial. 1 VRP at 295. For clarity, we use her former surname as it appears in the declaration supporting the warrant and her reports regarding the collision.

Pine's blood was drawn at about 7:00 a.m., five hours after the crash. The alcohol concentration in his blood at that time was approximately .072 grams per 100 milliliters. At trial, there was expert testimony that his blood alcohol concentration at 4:00 a.m., two hours after the collision, was between .102 and .132 grams per 100 milliliters.

The State charged Pine with one count of vehicular homicide, alleging that he drove "while under the influence of or affected by intoxicating liquor," or "in a reckless manner," or "with disregard for the safety of others." CP at 5.

## II. PRETRIAL

Before trial, Pine filed two motions to suppress the results of his blood draw. The first motion contended that the admission of drinking and odor of intoxicants were insufficient to support probable cause. The trial court stated that "maybe odor alone, or [bloodshot] eyes alone, wouldn't be sufficient. But when you have odor, eyes, . . . admission of drinking, and then most importantly the wreck itself and the driving, that is sufficient for a probable cause finding to issue the warrant." 1 Verbatim Rep. of Proc. (VRP) at 24. The second motion addressed a recall of the tubes used to collect blood draws.[3] The trial court denied both motions.

The State intended to call several witnesses to provide expert testimony, but it only provided the required discovery for some of the witnesses. During motions in limine, Pine moved to limit the testimony of certain troopers, including Trooper Swanson, to "personal observations" because the State had not given Pine notice that it intended "to qualify any of the troopers as expert witnesses on any subject." CP at 128. The trial court ruled that it would "exclude opinion testimony

---

[3] The tubes were recalled because some lacked additives that prevented the blood from clotting. At trial, the toxicology expert who tested Pine's blood explained that it is difficult if not impossible to test clotted blood and she would have noted on her report if Pine's blood was clotted.

unless and until an expert is qualified." 1 VRP at 60; *see* CP at 180 ("If the State chooses to qualify any officer as an expert so that [they] can provide opinion testimony, the State must provide discovery by September 18, 2020.").

### III. TRIAL

A.    Testimony that Pine Showed Signs of Impairment

Multiple police witnesses testified that Pine showed signs of impairment after the collision.

At trial, Trooper Swanson recounted her conversation with Pine at the scene. She stated that Pine was "very relaxed and very calm" while speaking to her about the collision. 1 VRP at 306. Swanson then said that being calm and relaxed after a major event like a car crash was "very indicative of somebody who is impaired." 1 VRP at 307. She also noted that the accident occurred soon after bars closed, she could smell an odor of intoxicants, and Pine's eyes were watery and bloodshot. Defense counsel did not object.

The prosecutor asked about Swanson's history of investigating driving under the influence cases. When the prosecutor then asked, "So, based on your training and experience, did [Pine's] demeanor potentially indicate impairment?" defense counsel objected. 1 VPR at 307. The trial court sustained the objection and the prosecutor moved on to questioning Swanson about her observations of Pine. On cross-examination, Swanson acknowledged that the collision itself could have caused Pine's bloodshot and watery eyes.

Trooper Jeff Street testified about speaking to Pine in an ambulance at the scene of the collision. Street recalled "a moderate odor of intoxicants coming out of the ambulance" and that Pine's eyes "were watery and bloodshot." 1 VRP at 429-30. And Pine told Street that he drank three beers that night in the hours before the accident.

Trooper Blake Willson testified about speaking to Pine in a patrol car after Pine's arrest. At trial, Willson explained his qualifications as a drug recognition expert. He stated, "I didn't get to spend a lot of time with [Pine]; but, from what I did observe of him, there was a moderate odor of intoxicants on his breath and he had bloodshot, watery eyes." 1 VRP at 418. The prosecutor then asked whether, based on Willson's "experience investigating driving under the influence case[s]" and as a drug recognition expert, "are those factors indicative of impaired driving?" *Id.* Willson responded, "Those are absolutely signs of impairment." *Id.* Defense counsel did not object. On cross-examination, counsel established that Willson could not identify which intoxicant he smelled and that Pine might have been in shock when Willson spoke to him. The forensic scientist who tested Pine's blood testified that based on retrograde extrapolation, two hours after the crash, Pine's blood alcohol concentration was between .102 and .132 grams per 100 milliliters.[4]

In contrast, several defense witnesses testified that they did not observe Pine showing signs of intoxication the night of the crash. The bartender who served Pine and another bar patron, who each knew Pine well, both testified that Pine's eyes were not red or watery and he did not appear intoxicated when he left the bar. And an officer who was Pine's sister-in-law, testified that she did not notice any signs of intoxication when she spoke to Pine at the scene. Pine's wife also testified that Pine's eyes were not red or watery when she arrived at the scene and that she did not smell alcohol before Pine cleaned himself with alcohol wipes in the ambulance.

B.     Testimony That Pine Asked for a Lawyer

Several witnesses mentioned that Pine asked for a lawyer at the scene of the collision.

---

[4] The jury was instructed that a person "is under the influence or affected by the use of intoxicating liquor" when they "have an alcohol concentration of 0.08 or higher within two hours after driving." CP at 300.

Trooper Swanson testified that, while they waited for doctors at the hospital, Pine began recounting the events of his day before the collision. She explained that "as we were waiting," Pine "began talking about what had happened during that day" before the crash. 1 VRP at 331. "[A]nd it should be noted I did not ask him anything. He had asked for an attorney. . . . [H]e just voluntarily started talking." *Id*. Defense counsel did not object.

Detective Michael Welander, who investigated the collision, also testified about briefly contacting Pine at the hospital. When asked whether he spoke with Pine, Welander stated, "I asked him or Trooper Swanson if he had requested an attorney, which he had, so I didn't interview him at that time." 1 VRP at 381.

Defense counsel also elicited testimony that Pine asked for a lawyer. First, on cross-examination of Welander, defense counsel established that Welander did not see Pine having any problems with balance or coordination at the hospital. Counsel then asked, "Did you speak to [Pine] at all?" 1 VRP at 398. Welander responded, "I believe I asked him if he asked for an attorney and he said he did, and that was the question I asked." *Id*.

Pine testified in his own defense. He volunteered during his testimony that he asked for a lawyer after admitting to officers at the scene that he had consumed three drinks before driving. He then stated that he refused field sobriety tests because he wanted to "'wait until [he spoke] to a lawyer or . . . somebody that [knew] more'" than him. 2 VRP at 853.

C.      Testimony about Pine's Eye Movements at the Hospital

Trooper Swanson also testified about a doctor examining Pine at the hospital. The prosecutor asked whether, as part of an examination to determine if Pine was injured, a doctor performed "a horizontal and vertical gaze nystagmus test." 1 VRP at 333. Pine objected that the

6

State was seeking to elicit expert testimony from a lay witness and the jury was excused while the parties discussed the issue.

The State explained that it intended to ask whether Swanson observed a horizontal gaze nystagmus test, what she observed during the test, and if she had seen similar movement to that of Pine's eyes in other driving under the influence investigations. During voir dire outside the presence of the jury, Swanson said that she observed a "lack of smooth pursuit" when Pine's eyes moved, which her training taught her was evidence of intoxication. 1 VRP at 337. After the State established that Swanson had been near Pine with a clear view of his eyes, the trial court ruled that Swanson could "describe in layman's terms what she observed" but prohibited any "use of scientific language that was gained during special training" that would result in expert opinion testimony. 1 VRP at 338.

Swanson then testified that a doctor tested Pine's "ability to track" and that she "observed as [Pine's eyes] traveled horizontally, left and right, that they were bouncing as they went." 1 VRP at 339. She did not testify further about whether this was evidence of impairment or intoxication.

Later, Detective Welander, who was qualified as a drug recognition expert, stated that he did not notice any issues with Pine's eyes at the hospital. He also explained that getting hit in the face with an air bag during a collision could cause bloodshot eyes. Welander testified that a horizontal gaze nystagmus test is a standard field sobriety test and he explained how the test is conducted. He stated that "bouncing of the eyes" alone does not mean a person is impaired, but it may support such a conclusion in combination with other factors. 1 VRP at 404.

D.      Accident Reconstruction Testimony

       1.      Testimony about airbag control module data from Pine's truck

The airbag control module in most vehicles stores assorted data about the vehicle from the last five seconds before the airbags are deployed or the vehicle abruptly changes velocity. Detective Shannon Beeler testified about downloading data from the airbag control module of Pine's truck. But because Beeler had not been qualified as an expert witness, the trial court initially prohibited the State from eliciting testimony about the data extraction and Beeler's training in that area. The trial court emphasized that Beeler was not qualified as an expert because the State failed to provide discovery about her credentials before the September 18, 2021, cutoff date.

On cross-examination, defense counsel elicited testimony about the limit of Beeler's involvement in the case:

Q. You had nothing to do with doing the search warrant for this car; is that right?
A. Right, that's correct.
Q. And you also didn't help store or keep that vehicle in any way, shape or form?
A. I did not.
Q. And once you gave that information to Detective Hedstrom, you also had nothing else to do with this case; is that right?
A. Correct. That was, essentially, my completion.

1 VRP at 456. The State argued that defense counsel's last question, asking Beeler whether she had "nothing else to do" with the case, opened the door to testimony the trial court previously excluded. The State then moved to admit testimony from Beeler about her extraction and analysis of data from Pine's truck and the report she prepared with her opinion about what the data represented. It requested permission to have Beeler explain her other actions in the case, beyond merely extracting the raw data.

The trial court stated that defense counsel's last question "was a very broad and open question" that "open[ed] the door to what this witness did in the case." 1 VRP at 459. But the court

cautioned that the door being opened did not give the State "free reign to go anywhere and everywhere." 1 VRP at 459-60. The State explained it intended to elicit Beeler's qualifications to analyze the data and her ensuing analysis, including "her opinion" and "what she concluded" from the data. 1 VRP at 460. The trial court allowed the testimony.

Beeler then testified that she had performed hundreds of data downloads, had experience using the data retrieval tool, and had been trained in analyzing and verifying the resulting data. She explained that Pine's truck was traveling between 43 and 46 miles per hour in the five seconds before the collision. The acceleration pedal was pressed down and the brakes were not activated during that time. The steering wheel was turned slightly to the left until less than half a second before the impact, when it was abruptly turned sharply to the right.

Beeler testified that the stretch of road Pine was traveling on in the five seconds before the collision was straight for the distance that he would have covered in that time. Therefore, because the road was straight and the steering wheel tilted left, she believed that Pine's truck had crossed the center line.

### 2.  Testimony about evidence at the scene of the collision

Detective Krista Hedstrom, who was certified in collision reconstruction, testified about her investigation of the wreck. She stated that the road where the crash occurred was straight and level, in good condition, and had rumble strips down the center. The speed limit was 55 miles per hour and the road was straight for at least 300 feet in either direction from the point of impact.

Hedstrom explained that the force of the crash dug several deep gouges into the pavement in the westbound lane. Lighter scrapes and tire marks led to the resting place of each vehicle. She stated that a vehicle driving over debris would not have enough force to cause the scrapes and

gouges. In particular, the amount of force required to make the gouges meant those marks showed "where maximum engagement occurred" during the collision. 2 VRP at 683.

Hedstrom testified that the "impact occurred in the middle of the westbound lane." 2 VRP at 695. The driver's side of Pine's truck crossed the center line and struck the front driver's side of Clearwater's car from an angle of roughly 11 o'clock. Only the rear passenger side tire of Pine's truck remained in the eastbound lane. The scrapes and tire marks were then caused by metal pieces and tires dragging across the pavement after the crash.

Because the vehicles had not struck each other with enough overlap, and because Pine's truck then hit an embankment that interfered with its trajectory, Hedstrom could not calculate how fast each vehicle was going before the crash from data at the scene. Hedstrom mentioned that Beeler determined Pine's truck was traveling around 45 miles per hour. But Hedstrom explained that she did not need to know the vehicles' speed to reconstruct the crash and that she formed her opinion about the cause of the collision before Beeler analyzed the airbag control module data.

E.      Pine's Testimony

Pine testified about the night of the collision. He stated that he drank three White Russians before leaving the bar. He also testified that the road had curves and a slope that the State's photos did not show. Pine explained that he looked down to adjust his radio as he came around a corner, then looked up to see that Clearwater's car was in Pine's lane, too close to avoid. He did not recall hearing his truck cross the rumble strips in the middle of the road.

Pine was firm in his belief that Clearwater was speeding. When his attorney asked, "And you obviously don't know [Clearwater's] actual speed; is that fair to say?" Pine agreed. 2 VRP at 830. Counsel asked whether Pine "tried to find out" if Clearwater was speeding. *Id.* Pine responded

10

that upon hiring his first lawyer—who was not his counsel at trial—he asked the lawyer "to get that black box [that] will tell you how fast [Clearwater] was going." 2 VRP at 831.

On cross-examination, the State returned to the early stages of the investigation, noting that Pine was "really looking forward to seeing the black box data from [Clearwater's] car." 2 VRP at 875. Pine agreed that he wanted his first lawyer to investigate the data from Clearwater's car. The prosecutor then asked if Pine had hired an expert:

> [PROSECUTOR:] As part of that process did you hire a reconstructionist?
> [PINE:] Myself?
> [PROSECUTOR:] Did your lawyer hire one for you?
> [PINE:] I believe so.
> [PROSECUTOR:] We haven't heard from that person today; why is that?
> [DEFENSE COUNSEL:] Objection, Your Honor.
> [PINE:] I couldn't tell you.

*Id.*

At a recess outside the presence of the jury, the trial court sustained the objection and warned the State it was "dangerously close to burden shifting." 2 VRP at 878. When the jury returned to the courtroom, the State announced that it had no further questions and defense counsel proceeded with redirect examination. The trial court did not instruct the jury that the last objection had been sustained, nor did it direct the jury to disregard any statements.

F.    Jury Instructions, Closing Arguments, Verdict, and Sentencing

The jury instructions reminded the jurors that the lawyers' "remarks, statements, and arguments" were not evidence. CP at 287. And the instructions told the jurors that any objections made during trial should not influence them and directed them to "not make any assumptions or draw any conclusions based on a lawyer's objections." CP at 288.

During closing arguments, the State and defense counsel both reminded the jury that the State had to prove all the elements of vehicular homicide beyond a reasonable doubt, and that Pine had no burden to disprove the State's theory of the case. The State did not mention Pine's decision to ask for a lawyer or his hiring of an accident reconstruction expert.

The jury convicted Pine of vehicular homicide. The trial court sentenced Pine under the reckless driving prong of vehicular homicide and imposed a 78-month sentence, which was at the bottom of the standard range.

Pine appeals his conviction.

## ANALYSIS

### I. INEFFECTIVE ASSISTANCE OF COUNSEL

Pine contends that he was deprived of effective assistance of counsel on several occasions. We disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution each guarantee effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). A defendant claiming ineffective assistance of counsel must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *State v. Linville*, 191 Wn.2d 513, 524, 423 P.3d 842 (2018). Because a defendant must show both prongs to establish ineffective assistance, the failure to demonstrate either prong will end our inquiry. *State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

First, counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017). We strongly presume that defense counsel performed effectively. *Id*. To rebut this presumption, the defendant must show

"the absence of any '*conceivable* legitimate tactic explaining counsel's performance.'" *Grier*, 171 Wn.2d at 42 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). Then, to demonstrate prejudice, the defendant must show a reasonable probability that the outcome of the proceeding would have been different but for the deficient performance, not just that there could have been some conceivable effect on the proceedings. *Estes*, 188 Wn.2d at 458.

A.      Warrant to Draw Pine's Blood

Pine argues that defense counsel performed deficiently by failing to include a *Franks* challenge in her motions to suppress the results of Pine's blood draw. He insists that a *Franks* challenge to the warrant would have prevailed, resulting in suppression of the blood draw evidence. We disagree.

1.      Principles of *Franks* challenges

The Fourth Amendment requires an evidentiary hearing if a "defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included" in an affidavit for a search warrant. *Franks*, 438 U.S. at 155-56 The claimed false statement or material omission must be "necessary to the finding of probable cause" to merit a hearing. *Id*. at 156. And the assertion that an affiant made a false statement "must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Id*. at 171. "'Allegations of negligence or innocent mistake are insufficient.'" *State v. Seagull*, 95 Wn.2d 898, 908, 632 P.2d 44 (1981) (holding that a warrant remained valid when police mistook a tomato plant for cannabis) (quoting *Franks*, 438 U.S. at 171). The remedy for a *Franks* violation is striking the material misrepresentation from the affidavit and determining "whether, as modified, the

affidavit supports a finding of probable cause." *State v. Chenoweth*, 160 Wn.2d 454, 469, 158 P.3d 595 (2007).

  2.  The alleged false statement in this case

  Here, Pine argues that the warrant affidavit "turned on" Trooper Swanson's "representations that she observed various indicia of intoxication" and that the trial showed that her representations were "likely intentionally or recklessly false." Appellant's Opening Br. at 49-50. He argues that testimony by other witnesses that he did not have bloodshot eyes or smell of alcohol "flatly contradicted" Swanson's assertions. Appellant's Opening Br. at 50.

  Pine argues based on *State v. Avery*, that an officer's observations of tiredness, a faint odor of intoxicants, and slight impairment after a car crash "were insufficient to give rise to probable cause of intoxication." Appellant's Opening Br. at 52 (citing 103 Wn. App. 527, 530, 13 P.3d 226 (2000)). *Avery* did not involve a request for a *Franks* hearing. Instead, that case addressed the applicability of the implied consent statute for testing blood alcohol concentration, RCW 46.20.308(2), which requires officers to give certain warnings about the right to refuse a breath or blood test if they have probable cause to believe the defendant was driving under the influence. 103 Wn. App. at 533. The trial court in *Avery* found that Avery's tiredness was explained by his work schedule and that two officers who were "experts in the field of recognizing persons under the influence" did not believe Avery was intoxicated, so "the implied consent statute did not apply" to require the officers to administer certain warnings before securing Avery's permission to draw his blood. *Id*. at 540-41. *Avery* is readily distinguishable from the facts before us.

  Pine has not made a substantial preliminary showing that Swanson knowingly or recklessly made a false statement necessary to the finding of probable cause that suggests he would have

prevailed had his attorney sought a *Franks* hearing. Swanson's declaration supporting the warrant explained that "[p]reliminary investigation of the collision scene indicate[d] Pine's vehicle crossed the centerline" and hit Clearwater's car. CP at 69. She stated that she "detected an obvious odor of intoxicants emanating from [Pine] and noted he had bloodshot, watery eyes." CP at 70. And she stated that Pine told another officer that he consumed three beers that night.

Even though there was later conflicting testimony at trial, several witnesses testified consistently with Swanson's declaration, undermining Pine's argument that she knowingly or recklessly made false statements to support a blood draw. Troopers Willson and Street both testified that they observed Pine with bloodshot, watery eyes and smelled alcohol on his breath at the scene. And Pine himself said that he had consumed three drinks before he began driving.

*Avery* was not a case involving a request for a *Franks* hearing, so we would apply *Avery* only if we were to first find that Swanson knowingly or recklessly made false statements. Pine has not raised *any* evidence that would constitute a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included" in the affidavit for the warrant. *Franks*, 438 U.S. at 155-56. Some contrary testimony regarding a disputed fact at trial is not enough to establish that Swanson made a false statement knowingly and intentionally, or with reckless disregard for the truth. Thus, Pine has not shown that the trial court would have granted a motion for a *Franks* hearing even if one had been made. Accordingly, counsel did not perform deficiently by not requesting a *Franks* hearing. We hold that Pine cannot show ineffective assistance from the lack of a *Franks* challenge to the affidavit supporting the warrant.

B.    Testimony that Pine Showed Signs of Impairment

Next, Pine argues that he received ineffective assistance when defense counsel failed to object to testimony from two troopers that their observations of Pine included signs associated with impairment. He reasons that the troopers' statements were impermissible comments on his guilt, so the trial court would have sustained objections had defense counsel made them. He also asserts that the failure to object was prejudicial. We disagree.

1.    Principles governing the decision to object

A decision on whether and when to object is a "classic example of trial tactics." *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). It is a legitimate trial tactic to forgo objecting to avoid highlighting certain evidence. *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019). "Conversely, counsel performs deficiently by failing to object to inadmissible evidence absent a valid strategic reason." *Id*. A defendant claiming ineffective assistance of counsel based on the attorney's failure to object must show that the trial court would have sustained the objection "and the result of the trial would have been different without the inadmissible evidence." *Id*. at 509; *see State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021). "'Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal.'" *State v. Johnston*, 143 Wn. App. 1, 19, 177 P.3d 1127 (2007) (quoting *Madison*, 53 Wn. App. at 763).

No witness may testify to their "opinion that the defendant is guilty." *Madison*, 53 Wn. App. at 760. Yet, "[t]estimony in the form of an opinion or inferences otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." ER 704. "To determine whether a witness's statement is improper opinion testimony on the defendant's

guilt, we consider the circumstances of the case, including the type of witness involved, the nature of the testimony, the nature of the charges, the type of defense, and other evidence before the trier of fact." *State v. McLean*, 178 Wn. App. 236, 248, 313 P.3d 1181 (2013).

2. Testimony about intoxication and impairment

"It has long been the rule in Washington that a lay witness may express an opinion on the degree of intoxication of another person where the witness has had an opportunity to observe the affected person." *City of Seattle v. Heatley*, 70 Wn. App. 573, 580, 854 P.2d 658 (1993). "[A] police officer may opine that, based on his experience and observations, the defendant was intoxicated and impaired." *McLean*, 178 Wn. App. at 248.

Pine points us to *State v. Quaale¸* where the Supreme Court held that it was improper to admit a trooper's testimony that, based *solely* on a horizontal gaze nystagmus test, there was "'no doubt'" "the defendant was impaired." 182 Wn.2d 191, 198, 340 P.3d 213 (2014). The *expert* testimony was inadmissible in Quaale's trial for driving under the influence because a horizontal gaze nystagmus test "merely shows physical signs consistent with ingestion of intoxicants" and is not by itself proof of a certain level of intoxication. *Id*. at 198. "Although an officer may testify that the test revealed signs *consistent* with alcohol consumption," the officer in *Quaale* "cast his conclusion in absolute terms and improperly gave the appearance that the [horizontal gaze nystagmus] test may produce scientifically certain results." *Id*. at 199 (emphasis added).

In contrast, in *McLean*, a trooper pulled over the defendant for weaving while driving, smelled alcohol, administered field sobriety tests, and then arrested the defendant for driving under the influence. 178 Wn. App. at 241. Although the trooper testified as a lay witness at trial, the State elicited testimony about his "training and experience in identifying impaired drivers." *Id*. The

trooper testified that he arrested "drivers for driving under the influence only if he believe[d] they [were] impaired by alcohol or drugs." *Id*. at 242. Defense counsel did not object. *Id*. We held that not objecting could "be characterized as a legitimate trial tactic seeking to avoid emphasizing [the trooper's] testimony about McLean's intoxication and arrest." *Id*. at 248. And we held that McLean could not demonstrate prejudice because under the circumstances, the trooper's "testimony did no more than convey his opinion that McLean was intoxicated." *Id*. at 249.

###### 3.     Trooper Swanson's testimony

Here, Pine cannot show the decision not to object to either trooper's testimony was deficient performance. Trooper Swanson testified that, in general, being relaxed after a major crash was "very indicative of somebody who [was] impaired." 1 VRP at 307. When the prosecutor asked whether Pine's behavior specifically "potentially indicate[d] impairment," defense counsel objected and the trial court sustained the objection. *Id*.

Although defense counsel did not object to Swanson's general statement that being relaxed after a car crash is indicative of impairment, counsel successfully objected when the State tried to elicit testimony that Pine's behavior indicated that he was impaired. Swanson was not qualified as an expert and she did no more than testify that relaxation after a major crash can be consistent with alcohol consumption. *See Quaale*, 182 Wn.2d at 199. We hold that defense counsel did not perform deficiently in this regard.

###### 4.     Trooper Willson's testimony

Defense counsel also did not perform deficiently by deciding not to object to portions of Trooper Willsons' testimony. Willson, who was qualified as a drug recognition expert, stated he "didn't get to spend a lot of time" with Pine but did observe "a moderate odor of intoxicants on

his breath" and that "he had bloodshot, watery eyes." 1 VRP at 418. Willson then testified that, based on his experience, bloodshot, watery eyes and the odor of alcohol on someone's breath were "absolutely signs of impairment." *Id*. On cross-examination, defense counsel questioned Willson about the signs of shock Pine might have been exhibiting and the fact that Willson could not identify the type of alcohol he smelled.

The *Quaale* court explained, that an expert witness may testify that certain signs they observe are "consistent with alcohol consumption," 182 Wn.2d at 199. That is precisely what occurred in this case. We also note that, unlike the officer in *Quaale*, Willson emphasized the brevity of his encounter with Pine and did not present his observations as "scientifically certain results." *Id*.

Pine has failed to demonstrate that he received ineffective assistance of counsel from his attorney's decision not to object to the troopers' testimony that he showed signs of impairment.

C.      Testimony that Pine Asked for a Lawyer

Pine next asserts that defense counsel performed deficiently by failing to object to testimony from several officers and by eliciting testimony from Pine that Pine invoked his right to an attorney on the night of the accident. He insists that any objection would have been sustained because the testimony was inherently prejudicial as a comment on his right to remain silent. He also asserts that defense counsel was ineffective for failing to advise him against testifying about why he asked for an attorney. Pine argues that there was no conceivable tactical reason for presenting his own testimony about why he asked for an attorney and that the testimony was prejudicial. We disagree.

"[I]t is constitutional error for a police witness to testify that a defendant refused to speak to him and for the State to purposefully elicit testimony as to the defendant's silence." *State v. Whitaker*, 6 Wn. App. 2d 1, 38, 429 P.3d 512 (2018). "But it is not a constitutional error for a police witness to make an indirect reference to the defendant's silence absent further comment from either the witness or the State." *State v. Romero*, 113 Wn. App. 779, 790, 54 P.3d 1255 (2002). "'Most jurors know that an accused has a right to remain silent and, absent any statement to the contrary by the prosecutor, would probably derive no implication of guilt from a defendant's silence.'" *State v. Slone*, 133 Wn. App. 120, 128, 134 P.3d 1217 (2006) (quoting *State v. Lewis*, 130 Wn.2d 700, 706, 927 P.2d 235 (1996)).

Pine relies on several cases to assert that any reference to the right to remain silent is not probative and cannot be cured by an instruction. In *State v. Nemitz*, Division Three held that a trial court erred by admitting evidence about a business card the defendant was "given by his attorney outlining what to do in the event of an arrest." 105 Wn. App. 205, 208, 19 P.3d 480 (2001). Division Three reversed because "[t]he only value of the card was its inference that only a person disposed to drink and drive would take anticipatory steps to avoid self-incrimination and to assert the right to counsel in the context of a [driving under the influence] stop." *Id*. at 215.[5]

No comment on Pine's silence occurred in this case. Here, Trooper Swanson and Detective Welander each briefly mentioned that Pine had asked for an attorney to explain why they did not question him at the hospital. And the second time Welander stated that Pine asked for an attorney was on cross-examination, as defense counsel asked whether Welander noticed Pine having any

---

[5] Pine also relies on two Ninth Circuit cases, *Douglas v. Cupp*, 578 F.2d 266 (9th Cir. 1978), and *United States v. Prescott*, 581 F.2d 1343 (9th Cir. 1978), but neither cases is comparable to the one before us.

problems with balance, coordination, or communication. And Pine volunteered that he asked for an attorney during his direct testimony to explain why he refused field sobriety tests.

Pine has not shown any improper question or answer that defense counsel should have objected to. At no point did the prosecutor or any police witness assert that Pine refused to answer questions. *See Lewis*, 130 Wn.2d at 706-07. Much like the right to silence, most jurors know that there is a constitutional right to an attorney and would not derive an implication of guilt from an accused person's request for counsel. *See id*.

In his reply brief, Pine asserts that counsel performs deficiently if they seek testimony about why a defendant was not more cooperative with the police, and he relies solely on cases holding that State comments on "lack of cooperation" are improper. Appellant's Reply Br. at 20. *See Romero*, 113 Wn. App. at 793; *State v. Clark*, 143 Wn.2d 731, 764, 24 P.3d 1006 (2001). But he cites no case holding that it is deficient performance to ask for testimony to explain a defendant's behavior. And it was tactical for the defense to tell the jury that Pine wanted to first talk to an attorney as a reason for why he declined to participate in field sobriety test.

Further, Pine cannot show prejudice. The State presented evidence that Pine's blood alcohol concentration was over the legal limit within two hours of the crash, as well as expert reconstruction testimony that Pine's truck crossed the center line into Clearwater's lane and caused the crash. Pine does not show how passing comments that he asked for a lawyer after a serious collision had a substantial likelihood of affecting the jury's verdict.

We hold that trial counsel performed effectively.

## II. TRIAL COURT RULINGS ADMITTING TESTIMONY

A.      Testimony about Pine's Eye Movements

Pine argues the trial court abused its discretion by allowing Trooper Swanson to testify that she observed Pine's eyes bouncing or twitching when a doctor examined him at the hospital. Pine asserts that this testimony was inadmissible without a foundation about Swanson's qualifications as a drug recognition expert or evidence that the doctor properly administered the test. We disagree.

Trial courts have "wide discretion to determine the admissibility of evidence." *State v. Demery*, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001). Where reasonable people "could take differing views regarding the propriety of the trial court's actions, the trial court has not abused its discretion." *Id.*

A trial court abuses its discretion if it admits improper opinion testimony "regarding the defendant's guilt or veracity." *State v. Rafay*, 168 Wn. App. 734, 805, 285 P.3d 83 (2012) However, "testimony that is based on inferences from the evidence, does not comment directly on the defendant's guilt or on the veracity of a witness, and is otherwise helpful to the jury does not generally constitute an opinion on guilt." *Id.* at 806.

Here, the trial court did not abuse its discretion when it admitted Swanson's observation. The trial court admitted only Swanson's observation that Pine's eyes were bouncing as they moved horizontally when the doctor was examining Pine. Swanson did not testify about whether her observation was evidence of intoxication or impairment. Pine does not establish that the State failed to lay an adequate foundation to admit Swanson's personal observation of his eyes. Instead he relies on a case about the admissibility of expert opinions: *State v. Baity*, 140 Wn.2d 1, 991 P.2d 1151 (2000).

22

For the first time in his reply brief, Pine argues that Swanson offered an improper opinion when she stated that a lack of smooth pursuit indicates intoxication. Swanson made her statement about smooth pursuit outside the presence of the jury and that statement was never admitted as evidence. Pine's argument therefore fails.

Pine also alleges prejudice because Detective Welander, who was qualified as a drug recognition expert, later described the purpose and process of a horizontal gaze nystagmus test and explained that "bouncing of the eyes" can indicate impairment in combination with other factors. Welander did not testify that Pine showed any signs of impairment. And Pine has never challenged Welander's qualifications or the admissibility of Welander's testimony about horizontal gaze nystagmus. And as discussed above, the State provided substantial evidence to argue that Pine was intoxicated, including multiple police witnesses who observed Pine having bloodshot and watery eyes at the scene and expert testimony that Pine's blood alcohol concentration was over the legal limit within two hours of the collision.

The trial court did not abuse its discretion by admitting Swanson's observations.

B.    <u>Testimony about Data from Pine's Truck</u>

Pine contends that the trial court abused its discretion by ruling that defense counsel opened the door to Detective Beeler's previously excluded expert testimony about the airbag control module data obtained from Pine's truck. He also argues that the testimony was prejudicial because otherwise, "the State relied primarily on subjective interpretations of tire marks, debris, and vehicle damage to establish causation" through Detective Hedstrom's testimony. Appellant's Opening Br. at 31. We disagree.

Even assuming without deciding that the trial court improperly admitted Beeler's expert testimony, Pine cannot show prejudice. Pine does not claim a constitutional violation from admitting the testimony. If a defendant does not assert a constitutional violation from a trial court's erroneous admission of evidence, then we will apply the nonconstitutional harmless error standard to determine if reversal is required. *State v. Barry*, 183 Wn.2d 297, 317, 352 P.3d 161 (2015). Under this standard, the defendant must demonstrate there is a reasonable probability that the error affected the outcome of the trial. *Id*. at 317-18.

Beeler testified that Pine's truck was traveling almost ten miles under the speed limit, which was favorable to Pine. She stated that the truck did not brake before the collision, which supported Pine's assertion that he merely glanced down at the radio and did not see Clearwater's headlights until it was too late to react. The testimony that was most detrimental to Pine was Beeler's statement that the steering wheel was turned slightly left in the seconds before the crash, while the road was straight. But the State also presented expert accident reconstruction testimony from Detective Hedstrom that, based on evidence at the scene, including gouges and tire marks in Clearwater's lane, the collision was caused by Pine's truck entering Clearwater's lane. And Hedstrom explained that she formed her opinion about the cause of the collision before knowing Beeler's analysis of the data. Thus, Beeler's testimony was either helpful to Pine or it was duplicative of other expert testimony, which also established that Pine crossed the center line and hit Clearwater's car in Clearwater's lane. Pine therefore cannot demonstrate a reasonable probability that admitting Beeler's expert testimony affected the outcome of the trial.

We hold that any error regarding Beeler's testimony was harmless.

### III. PROSECUTORIAL MISCONDUCT

Pine next argues that the prosecutor impermissibly shifted the burden of proof by asking him why his accident reconstruction expert did not testify at trial. Even though defense counsel successfully objected, Pine contends that "the jury could not be expected to forget this unfairly prejudicial line of inquiry during deliberations." Appellant's Opening Br. at 21. And Pine reasons that the State cannot show the error was harmless. We disagree.

Citing cases from the early 2000s, Pine asserts, "Improper burden shifting arguments by the prosecutor are subject to the constitutional harmless error standard." Appellant's Opening Br. at 26 (citing *State v. Toth*, 152 Wn. App. 610, 615, 217 P.3d 377 (2009)). But in 2012, the Supreme Court expressly declined to adopt the constitutional harmless error standard for evaluating claims of burden shifting in the context of prosecutorial misconduct claims. *State v. Emery*, 174 Wn.2d 741, 757, 278 P.3d 653 (2012). Instead, we apply the "established standard of review" for prosecutorial misconduct claims. *Id*. at 758.

When a defendant has objected to the prosecutor's alleged misconduct below, the defendant must show both that the prosecutor's remarks were improper and that there is a substantial likelihood the improper remarks affected the jury's verdict. *Id.* at 759-60. "[T]he State bears the burden of proving its case beyond a reasonable doubt" and a prosecutor's argument that "subtly shifts" that burden to the defendant is improper. *Id*. at 760.

Assuming the State's line of questioning was improper, Pine fails to show the necessary prejudice. After Pine explained in direct testimony that he wanted Clearwater's car analyzed to determine if he was speeding, the prosecutor asked if Pine had hired a "reconstructionist." 2 VRP at 875. When Pine answered affirmatively, the prosecutor asked, "We haven't heard from that

25

person today; why is that?" and defense counsel promptly objected. *Id.* The trial court sustained the objection. The trial court did not tell the jury to ignore Pine's answer, "I couldn't tell you," but the jury instructions directed the jurors to avoid making assumptions or drawing conclusions from the objections and reminded jurors that the lawyers' statements and arguments were not evidence. *Id.*

Defense counsel's objection halted the line of questioning. And the prosecutor did not suggest at any point during closing or rebuttal argument that Pine had a burden to disprove the State's theory of the case. The State's closing argument concentrated on all of the inculpatory evidence presented, steering clear of any improper argument about a lack of exculpatory evidence. In sum, the exchange regarding Pine's expert was brief, the trial court's ruling sustaining defense counsel's objection was effective, and the State never brought the jury's attention back to the issue. Pine has not shown a substantial likelihood that the exchange affected the jury's verdict.

Finally, Pine fails to show any error, so the cumulative error doctrine does not apply.

No. 56439-4-II

CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, C.J.

We concur:

Cruser, A.C.J.

Che, J.