# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Matter of the Personal Restraint of:<br><br>DONALD WILLIAM BANGO,<br><br>Petitioner. | No. 57251-6-II<br><br><br>UNPUBLISHED OPINION |

VELJACIC, J. — In this timely personal restraint petition (PRP), Donald Bango seeks relief from personal restraint imposed following his 2017 Pierce County convictions of murder in the second degree, assault in the second degree, criminal impersonation, and witness tampering. He contends (1) that trial counsel was deficient in failing to move to sever the witness tampering count, resulting in prejudice and a violation of his right to a fair trial,[1] (2) that appellate counsel was deficient in failing to assign error to trial counsel's failure to move to sever and in failing to raise the issue of an erroneous jury instruction on direct appeal, (3) and that the jury instructions regarding unlawful imprisonment confused and misled the jury, which effectively reduced the State's burden of proof on the charged crimes. Bango also asks us to revisit the arguments raised in his direct appeal and statement of additional grounds (SAG) for review under the cumulative error doctrine. In the alternative, Bango asks us to remand for a reference or evidentiary hearing pursuant to RAP 16.12.

---

[1] The State also charged Bango with one count of murder in the first degree. However, the jury found Bango not guilty.

We hold that Bango fails to show any grounds for relief from personal restraint and deny his petition.

FACTS

I.     BACKGROUND FACTS[2]

On December 13, 2015, Bango called Curtis Wikstrom to act as a middleman in buying heroin from Jeffrey Shaw.  Sometime after midnight, Bango picked up Wikstrom in a rented black sport utility vehicle (SUV).  Bango backed the SUV into a space in the parking lot of an apartment building.  Bango and Wikstrom talked as they waited for Shaw to arrive, but Bango started to get impatient after about 20 or 25 minutes.  Wikstrom testified that Bango cycled the action of a 12-gauge pump shotgun that was on the floorboard, pointed to an AK-47 in the back seat of the car, and took a pistol from the pocket of his jacket.  He told Wikstrom that he had money for the heroin in the glove box, but Wikstrom did not find any money there.

Jesse Neil testified that Shaw asked him for a ride to meet Wikstrom.  Before they left Shaw's house, Neil saw Shaw put a gun in his waistband.  Neil drove Shaw to the apartment building.  Wikstrom asked Bango for the money to pay for the drugs.  Bango told Wikstrom to have Shaw come to him.  Wikstrom gave Shaw the message and walked back toward the SUV intending to tell Bango to come to Neil's car when he saw Bango pulling on black gloves.  Wikstrom was afraid of getting shot, so he ran back to Neil's car, jumped in the back seat, and told Neil to drive away.  Neil drove out of the parking lot and started heading back to Shaw's house.  Wikstrom told Shaw and Neil that Bango had a lot of guns with him and no money.

---

[2]  The facts are substantially based on those recited in Division I's opinion in *State v. Bango¸* No. 81045-6-I    (Wash.    Ct.    App.    Mar.    22,    2021)    (unpublished), https://www.courts.wa.gov/opinions/pdf/810456.pdf.

Bango immediately started calling Wikstrom's phone. Shaw answered the phone and agreed to meet Bango in a public place but told him that he had a gun. Bango suggested a 7-Eleven near the apartment complex. When they arrived, Bango walked out of the store and approached the passenger side of the car. Bango retrieved a scale from his vehicle, and Shaw placed it on the center console of Neil's car. Shaw weighed the heroin and told Bango to take a look at it. Bango looked in the window, then revealed a badge and told them there were cops all around and to get out of the car. Shaw told Neil that Bango was not a cop and to get out of there. Wikstrom saw Bango reaching for the jacket pocket where he had previously put the pistol and yelled that he was pulling his gun. Neil put the car in reverse and heard gunshots as he was pulling out.

Bango fired two shots, one of which hit Shaw in the chest. Neil sped away and drove directly to the hospital. Neil was sure that Shaw never pulled his gun while they were in the 7-Eleven parking lot because Neil grabbed the gun from Shaw's waistband on the way to the hospital and put it under the driver's seat. Shaw died about 15 minutes after he arrived at the hospital. Officers later recovered a silver and black Kahr .40-caliber semiautomatic pistol from beneath the driver's seat of Neil's car.

In December 2015, the State charged Bango with murder in the first and second degree and criminal impersonation in the first degree. The State would go on to file a total of three amended informations on October 2016, February 2017, and May 2017.[3] The charge of tampering with a witness was first added in the State's second amended information, filed in February 2017.

II.   TRIAL

Bango exercised his right to a jury trial and chose not to testify. During trial, the jury heard Bango's description of the incident through the redacted version of his interview with detectives

---

[3] This third amended information was filed during trial in May 2017.

3

Vold and Nist. Bango admitted that he was wearing a lanyard around his neck with a badge on it as a "little security policy" to keep him from getting robbed. *State v. Bango¸* No. 81045-6-I, slip op. at 8 (Wash. Ct. App. Mar. 22, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/810456.pdf. Bango stated that he approached the passenger window of the car at the 7-Eleven and handed Shaw $294. He saw a gun in the center console of Neil's car that he described as a stainless and black "1911 style Para Ordinance" with writing toward the front of the barrel. *Id.* While Bango was talking to Shaw, he noticed that Neil had his hand on the gear shift and became concerned that "something [was] getting ready to happen." *Id.* Bango said he saw Shaw reach for the gun in the console with his left hand, so he pulled out the badge and told them to get out of the car. He said that Shaw pulled the trigger, but the gun did not fire. Bango recalled seeing the hammer move and hearing an audible click. At the same time, Bango stated that he fired a shot that hit the door of the car, which then sped out of the parking lot.

The jury heard testimony from Johan Schoeman, a forensic scientist and firearm and tool marks examiner with the Washington State Patrol crime laboratory. Schoeman examined both guns related to this case. He stated that he had tested the Kahr .40 caliber pistol recovered from Neil's vehicle and found it to be fully operable. He did not find any evidence that the gun had misfired. He also testified that the Kahr does not have a visible hammer.

The jury also watched video surveillance from the 7-Eleven. The video footage clearly shows a black SUV arriving, and Bango entering the store. Seconds later, a white sedan parks next to the SUV and Bango exits the store and walks over to the passenger side of the sedan. Bango then places his phone on the roof while talking to the people in the sedan. Bango opens the SUV's driver's side door, retrieves something from inside, and closes the door. Bango continues

talking to the people in the sedan while fidgeting with something in his hands. Bango then unzips his coat and goes closer to the passenger window of the sedan. Suddenly, the sedan begins reversing out of the parking spot and Bango is seen following the sedan until it leaves the lot completely. Bango gets into the SUV and leaves the lot in the opposite direction.

The State also provided redacted recorded jail calls between Gleen Seward and his sister Kelcie Seward in conjunction with Facebook messages between Kelcie[4] and Wikstrom. In the jail calls, Gleen, who was incarcerated with Bango, is heard telling Kelcie to put the name Curtis Wikstrom into her phone along with his phone number. Gleen then tells her to "find out where he's at" and to "try to become his friend on Facebook" but that Kelcie "can't tell [Wikstrom] why." Ex. 337 (Dec. 27, 2015 phone call) at 1:20-1:27, 1:36-1:37.

The next day, Kelcie informs Gleen that she found Wikstrom, stating, "he's in hilltop." Ex. 337 (Dec. 28, 2015 3r phone call) at 1:19-1:21. Kelcie asks why she needs to be in contact with Wikstrom, to which Gleen replies that it's "one of those things that can't be talked about on the phone" but needs "to find him to make sure he doesn't testify." *Id.* at 1:38-1:40, 1:45-1:48. Next, Gleen tells Kelcie to Facebook message Wikstrom the following, "so we have mutual friends and those friends are saying that you are talking about a serious case from a year ago and maybe it would be best for you to stop talking." Ex. 98. She did.

Before the end of the trial, the State filed a third amended information charging Bango with murder in the first degree, murder in the second degree, murder in the second degree while committing or attempting to commit the crimes of assault in the second degree and/or criminal

---

[4] Due to Gleen and his sister, Kelcie, having the same last name, we refer to each by their first names. No disrespect is intended.

impersonation in the first degree, criminal impersonation in the first degree, and tampering with a witness.

A.    Jury Instructions

After the close of trial in June 2017, the court discussed the two sets of proposed jury instructions. Notably, defense counsel did not object when the court discussed the language in what would become instruction 9, which required the jury to decide each crime separately. The jury instructions at issue read as follows:

INSTRUCTION NO. 9

A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count.

. . . .

INSTRUCTION NO. 48

A person commits the crime of unlawful imprisonment when he or she knowingly restrains the movements of another person in a manner that substantially interferes with the other person's liberty if the restraint was without legal authority and was without the other person's consent, or accomplished by physical force, intimidation, or deception.

INSTRUCTION NO. 49

A person knows or acts knowingly or with knowledge with respect to a fact, circumstance or result when he or she is aware of that fact, circumstance, or result. It is not necessary that the person know that the fact circumstance or result is defined by law as being unlawful or an element of a crime.

If a person has information that would lead a reasonable person in the same situation to believe that a fact exists, the jury is permitted but not required to find that he or she acted with knowledge of that fact.

When acting knowingly as to a particular fact is required to establish an element of a crime, the element is also established if a person acts intentionally as to that fact.

INSTRUCTION NO. 50

Restraint or restrain means to restrict another person's movements without consent and without legal authority in a manner, which interferes substantially with that person's liberty. Restraint is without consent if it is accomplished by physical force, intimidation or deception.

6

Clerk's Papers (CP) at 363, 403-05. The court then discussed the proposed instructions relating to unlawful imprisonment:

> THE COURT: [] "A person commits the crime of unlawful imprisonment."
> [Defense]: I have an objection to that. I don't think it's necessary because if we're going to get into—I think what this refers back to is—if you look at Instruction No. 28, any unlawful—any other unlawful purpose. Mr. Sheeran wants to argue that—I would assume he wants to argue that holding the gun or flashing the badge was an unlawful imprisonment, which is another unlawful purpose. Well, you could have a million other crimes that would—or acts that would—any unlawful purpose there, and to specifically define that particular crime is unnecessary.
> [Prosecution]: I think in a way by defining it, it's putting the—setting the parameters for preventing the State from arguing random things or from the jury just kind of speculating on what other unlawful purpose may have been going on. . . .
> THE COURT: I'm going to grant it over defense objection.

Rep. of Proc. (RP) (June 21, 2017) at 2616-17. After further deliberation and argument, both attorneys agreed on the set of instructions that would be given to the jury. However, Bango later noted an objection to instruction 48 defining unlawful imprisonment, arguing that while it was a correct statement of the law, "unlawful imprisonment is not charged. It is not alleged. There is no facts to warrant that [] Bango has committed that crime. It appears that the State is seeking to have that supplement instruction 46, which is the criminal impersonation in the first degree and the phrase 'any other purpose.'" RP (June 22, 2017) at 2648. No further discussion took place regarding Bango's objections.

B.     Jury Questions

During the course of jury deliberations, the trial court received a question from the jury: "Instruction 58 does not address count [three]. Do we address [three], regardless of our choices

7

on count [one] and [two]?"[5] CP at 416. After discussing with counsel how to answer the jury's question, the court proposed the following answer: "Yes. Please address all counts, [one, two, three, four, and five]. Refer to Instruction No. 9. . . . All counts do not have a lesser included . . . offense." RP (June 26, 2017) at 2774. Defense counsel responded, stating they would not have put the last sentence in the answer "but [that] if the Court [felt] that's necessary, [it] [was] fine." RP (June 26, 2017) at 2775. The final answer to the jury was as the court proposed.

C.      Verdict

The jury found Bango not guilty of murder in the first degree but guilty of the remaining charges. Prior to sentencing, the trial court dismissed the charge for murder in the second degree while committing or attempting to commit the crimes of assault in the second degree and/or criminal impersonation in the first degree.

D.      Direct Appeal

Bango appealed his convictions. On direct appeal, he argued (1) a *Batson*[6] violation, (2) that the State failed to prove self-defense, (3) that the trial court erred when giving an aggressor instruction and in admitting his statements in violation of his *Miranda*[7] rights, (4) prosecutorial misconduct, and (5) ineffective assistance of counsel for failure to object or renew an objection to alleged instances of prosecutorial misconduct during closing argument. Ultimately, Division I of this court affirmed Bango's convictions and sentence but remanded following the State's concession that Bango's dismissed conviction for murder in the second degree while committing

---

[5] Count three of the third amended information is murder in the second degree "while committing or attempting to commit the felony crimes of Assault in the Second Degree and/or Criminal Impersonation in the First Degree." CP at 158.

[6] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[7] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

or attempting to commit the crimes of assault in the second degree and/or criminal impersonation in the first degree should have been vacated not dismissed. Bango filed a petition for review with the Washington Supreme Court that was denied. The mandate was issued on September 10, 2021.

E.     PRP

On September 6, 2022, Bango timely filed this PRP.[8] Subsequently, we appointed counsel, who filed additional briefing.

## ANALYSIS

I.     PRP LEGAL PRINCIPLES

We may grant relief to a personal restraint petitioner who is unlawfully restrained. RAP 16.4(a). "Relief by way of collateral challenge to a conviction is an 'extraordinary' remedy for which petitioners must overcome a 'high standard before [we] will disturb an otherwise settled judgment.'" *In re Pers. Restraint of Davis*, 200 Wn.2d 75, 80, 514 P.3d 653 (2022) (internal quotation marks omitted) (quoting *In re Pers. Restraint of Finstad*, 177 Wn.2d 501, 506, 301 P.3d 450 (2013)).

To prevail in a PRP, a petitioner must establish by a preponderance of the evidence (1) a constitutional error that resulted in actual and substantial prejudice or (2) a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice. *In re Pers. Restraint of Meredith*, 191 Wn.2d 300, 306, 422 P.3d 458 (2018). Establishing "actual and substantial prejudice" means more than merely showing the possibility of prejudice; the petitioner must establish that if the alleged error had not occurred, the outcome more likely than not would

---

[8] RCW 10.73.090(1) requires that a PRP be filed within one year of the date that the petitioner's judgment and sentence becomes final. Bango's judgment and sentence became final on September 10, 2021, when this court issued the mandate following his direct appeal. RCW 10.73.090(3)(b). Bango timely filed his initiation petition less than a year later, on September 6, 2022.

have been different. *In re Pers. Restraint of Meippen*, 193 Wn.2d 310, 315-16, 440 P.3d 978 (2019).

A reference hearing "is appropriate where the petitioner makes the required prima facie showing[,] 'but the merits of the contentions cannot be determined solely on the record.'" *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 18, 296 P.3d 872 (2013) (quoting *In re Pers. Restraint of Hews*, 99 Wn.2d 80, 88, 660 P.2d 263 (1983)). The petitioner must show that he has competent, admissible evidence to establish facts that would entitle him to relief. *Id*. Bald assertions and conclusory allegations are insufficient. *Id*. And the factual allegations must be based on more than speculation and conjecture. *Id*.

## II.    INEFFECTIVE ASSISTANCE OF COUNSEL

### A.    Legal Principles

"The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel." *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). "We apply the same prejudice standard to ineffective assistance claims brought in a personal restraint petition as we do on appeal." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 538, 397 P.3d 90 (2017). We review claims of ineffective assistance of counsel de novo. *State v. Stotts*, 26 Wn. App. 2d 154, 162, 165, 527 P.3d 842 (2023).

To be entitled to collateral relief in a PRP raising an ineffective assistance of counsel claim, the petitioner must show both that (1) defense counsel's representation was deficient and (2) the deficient representation was prejudicial. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 840, 846-47, 280 P.3d 1102 (2012) (applying *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d

1260 (2011). If one prong of the test fails, we need not address the remaining prong. *State v. Crow*, 8 Wn. App. 2d 480, 507, 438 P.3d 541 (2019).

A petitioner alleging ineffective assistance of counsel must overcome a strong presumption that counsel's performance was reasonable. *Id*. "When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). If the allegedly ineffective assistance is based on counsel's failure to move to sever, the defendant must demonstrate two things to establish prejudice. *State v. Sutherby*, 165 Wn.2d 870, 884, 204 P.3d 916 (2009). First, the defendant must show that the trial court likely would have granted a motion to sever. *Id*. Second, the defendant must show that it is reasonably probable that the jury would not have found him guilty if the court had granted the motion. *Id*.

B.      Ineffective Assistance of Trial Counsel

Bango asserts he was denied effective assistance of counsel because his trial attorney did not move to sever the witness tampering count from the murder and impersonation counts in the State's third amended information. He argues there was no legitimate strategic or tactical reason for counsel to fail to move to sever. Additionally, he argues that the motion to sever likely would have been granted, and that proceeding to trial on the tampering count together with the other charges prejudiced him because the verdict probably would have been different had the tampering count been severed.

The State counters that Bango cannot show trial counsel's decision was not a legitimate trial tactic. The State adds that Bango also fails to show he was prejudiced. Specifically, that had a motion to sever been filed, the trial court would have denied it because any potential prejudice

11

did not outweigh concerns for judicial economy, and because the evidence was cross-admissible

under ER 404(b).  We agree with the State.

Joinder of offenses is governed by CrR 4.3:

> **(a) Joinder of Offenses.**  Two or more offenses may be joined in one charging document, with each offense stated in a separate count, when the offenses, whether felonies or misdemeanors or both:
> (1) Are of the same or similar character, even if not part of a single scheme or plan; or
> (2) Are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.

The standard of review of trial court motions granting or denying joinder motions is abuse

of discretion.  *State v. Martinez*, 2 Wn.3d 675, 682, 541 P.3d 970 (2024).  In turn, CrR 4.4 governs

severance of offenses, noting:

> **(a) Timeliness of Motion—Waiver.**
> (1) A defendant's motion for severance of offenses or defendants must be made before trial, except that a motion for severance may be made before or at the close of all the evidence if the interests of justice require.  Severance is waived if the motion is not made at the appropriate time.
> (2) If a defendant's pretrial motion for severance was overruled he may renew the motion on the same ground before or at the close of all the evidence.  Severance is waived by failure to renew the motion.
> **(b) Severance of Offenses**.  The court, on application of the prosecuting attorney, or on application of the defendant pursuant to subsection (a), shall grant a severance of offenses whenever before trial or during trial with consent of the defendant, the court determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense.

*See also State v. Bluford*, 188 Wn.2d 298, 306, 393 P.3d 1219 (2017).

Separate trials are not favored in Washington because of concerns for judicial economy,

"[f]oremost among these concerns is the conservation of judicial resources and public funds."

*State v. Bythrow*, 114 Wn.2d 713, 723, 790 P.2d 154 (1990).

"Severance of charges is important when there is a risk that the jury will use the evidence

of one crime to infer the defendant's guilt for another crime or to infer a general criminal

disposition." *Sutherby*, 165 Wn.2d at 883.  When determining whether the potential for prejudice requires severance, a trial court must consider the following four factors: (1) the strength of the State's evidence on each count, (2) the clarity of defenses as to each count, (3) the court's instructions to the jury to consider each count separately, and (4) the admissibility of evidence of the other counts even if not joined for trial.  *State v. Russell*, 125 Wn.2d 24, 63, 882 P.2d 747 (1994).  Nevertheless, it may be appropriate to deny severance even if not all four of the factors are met.  *See Bythrow*, 114 Wn.2d at 720 ("[T]he fact that separate counts may not be cross-admissible does not necessarily represent a sufficient ground as a matter of law [to sever the offenses].").

"A defendant 'seeking severance ha[s] the burden of demonstrating that a trial involving [all] counts would be so manifestly prejudicial as to outweigh the concern for judicial economy.'" *State v. Slater*, 197 Wn.2d 660, 676, 486 P.3d 873 (2021) (alterations in original) (quoting *Bythrow*, 114 Wn.2d at 718).  Therefore, a party "must generally move for severance pretrial and renew a denied pretrial motion for severance 'before or at the close of all the evidence'" or waive his or her severance arguments.  *Bluford*, 188 Wn.2d at 306 (quoting CrR 4.4(a)).  In other words, issues related to severance are waived if the defendant fails to renew a motion before or at the close of all the evidence.  CrR 4.4(a)(2).

Here, we cannot conclude that trial counsel's lack of motion for severance fell below an objective standard of reasonableness.  Just as trial counsel's decision to object or retain an expert is seen as a classic example of trial tactics, the decision whether to file a motion to sever is similarly a classic example of trial tactics.  *See State v. Bogdanov*, 27 Wn. App. 2d 603, 634 , 532 P.3d 1035 (2023) ("'[G]enerally the decision whether to call a particular witness is a matter for differences of opinion and therefore presumed to be a matter of legitimate trial tactics.'" (quoting *Lui*, 188

13

Wn.2d at 545)); *see also State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021) (Trial counsel's decision about when, and how, to object is a "classic example of trial tactics."). But even if defense trial counsel was deficient in deciding not to move for severance, for a claim of ineffective assistance of counsel to succeed, prejudice must follow from the alleged deficiency.

Bango does not demonstrate he was prejudiced as a result of counsel's failure to move for severance. Bango does not demonstrate a reasonable probability that the result of the proceeding would have been different; specifically, that the jury would not have found him guilty in separate trials. To determine whether Bango suffered prejudice, we apply the four *Russell* factors outlined above.

###### 1. The Strength of the State's Evidence on Each Count

Severance is proper "[w]hen one case is remarkably stronger than the other." *State v. MacDonald*, 122 Wn. App. 804, 815, 95 P.3d 1248 (2004).

With respect to factor one, Bango argues that the evidence that he contacted Wikstrom as part of the witness tampering count was stronger than the evidence presented refuting his self-defense claim. This is supported, he argues, by the jury's acquittal on count I—first degree murder. He adds that the evidence the State relied on was full of inconsistent statements made by their key witnesses—Neil and Wikstrom.

The State asserts that it presented strong evidence supporting all of the counts. The State highlights that in addition to Neil and Wikstrom providing inconsistent statements, Bango, too, was inconsistent, during his police interview. The State also argues that even if there were inconsistencies in Neil and Wikstrom's statements, witness credibility is for the jury as trier of fact to determine. We agree with the State.

Looking separately at each count, the evidence consists of lay witness and expert testimony, video surveillance, and a recording of Bango's interview with detectives.

As to count two, murder in the second degree, the State was required to prove that Bango killed Shaw and had the intent to cause his death while armed with a firearm. RCW 9A.32.050(1)(a). Bango claimed self-defense, which admits the underlying conduct forming the basis of the charge. *See State v. Barragan*, 102 Wn. App. 754, 762, 9 P.3d 942 (2000) (holding defendants are not entitled to self-defense instructions if they deny committing the act underlying the charged crime); *see also State v. Gogolin*, 45 Wn .App. 640, 643-44, 727 P.2d 683 (1986) (defendant denied underlying assault); *State v. Pottorff*, 138 Wn. App. 343, 348, 156 P.3d 955 (2007) ("A defendant asserting self-defense is ordinarily required to admit an assault occurred.").

The State has the burden of disproving self-defense. In his interview, which was presented to the jury, Bango admitted he fired at Shaw but claimed he did so because Shaw pointed a gun at him first and pulled the trigger, though he suggests a misfire prevented discharge. But the forensic scientist and firearm and tool marks examiner testified that the pistol recovered from Neil's car was fully operable upon testing and showed no evidence of a misfire. Additionally, Neil and Wikstrom testified that Shaw never drew his gun from the waistband of his pants.

#### 2. The Evidence Disproving Self-Defense was Strong

For count four, criminal impersonation in the first degree, the State was required to prove that Bango assumed a false identity and pretended to represent "some person or organization or a public servant and d[id] an act in his or her pretended capacity with intent to defraud another or for any other unlawful purpose." RCW 9A.60.040(1)(b). During his interview with detectives, Bango admits that he had a badge around his neck on a lanyard as a "little security policy," to guard against being robbed by Shaw, and that he showed it to Shaw, Neil, and Wikstrom while

15

telling them there were "cops all around us." *Bango¸* No. 81045-6-I, slip. op. at 3, 8. He then proceeded to order Shaw and the others out of the car. The evidence of criminal impersonation was strong. Particularly, Bango's purpose, to restrain the vehicle's occupants in furtherance of ultimately obtaining heroin, meets the element requiring that the impersonation be intended for "any unlawful purpose." RCW 9A.60.040(1)(b).

Finally, for count five, tampering with a witness, the State was required to prove that Bango attempted to induce Wikstrom to either testify falsely, without right or privilege to do so, withhold any testimony or absent himself from any official proceeding, and that Wikstrom be a witness or a person Bango had reason to believe was about to be called as a witness in any official proceedings. RCW 9A.72.120(1)(a). Bango concedes that the evidence showing he contacted Wikstrom via the Seward siblings is strong. The Facebook messages and recording of the jail calls between Gleen and Kelcie are unambiguous. Accordingly, when viewed separately, the evidence supporting each count was strong, weighing against severance.

### 3. Clarity of Defenses as To Each Count

The second factor to consider is whether the clarity of defenses to each count was prejudiced by joinder. *Russell*, 125 Wn.2d at 64. "The likelihood that joinder will cause a jury to be confused as to the accused's defenses is very small where the defense is identical on each charge." *Id*.

Bango fails to offer an argument on factor two, and the State asserts this is a concession as to this factor. We agree. This factor weighs against prejudice.

### 4. Court Instructions to Jury to Consider Each Count Separately

The third factor is whether the trial court properly instructed the jury to consider each count separately. *Id.* at 66. Bango argues that in spite of the court's instruction to consider each count

16

separately, the prosecutor explicitly invited the jury to consider the evidence of witness tampering as it relates to the charge of murder.

In response, the State argues that Bango presented no evidence that the jury did not follow the court's instruction. Specifically, it points to instruction 9 that reads, "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." CP at 363. The State argues it was unlikely that the jury conflated the issues before them as they were distinct and straightforward: (1) whether Bango murdered Shaw and impersonated an officer and (2) whether Bango attempted to tamper with a witness and influence testimony. We agree with the State.

We presume that the jury followed the court's instructions. *State v. McDaniel*, 155 Wn. App. 829, 861, 230 P.3d 245 (2010). Moreover, we have previously held that the instruction given by the trial court is sufficient to eliminate prejudice from joinder of the charges. *Id*.

Bango's argument regarding the prosecutor's invitation to consider evidence of witness tampering as it relates to guilt of the murder charge is unpersuasive. Our inquiry under this factor is solely whether the court instructed the jury properly. It did so here. This factor weighs against prejudice.

Finally, relying on *Sutherby*, Bango argues that that a prosecutor's statement can undermine the court's instruction resulting in prejudice and that there is no "'legitimate strategic or tactical reason'" for failing to move for severance where the evidence on one set of counts would prejudice the defense against another set of counts. Supp. Br. of Pet'r at 32 (quoting *Sutherby*, 165 Wn.2d at 884), 48. But *Sutherby* is distinguishable.

In *Sutherby*, the prosecutor argued that evidence of Sutherby's possession of depictions of minors engaged in sexually explicit conduct proved he raped and molested the children, conduct

17

for which he was also charged. 165 Wn.2d at 885. But the evidence related to the latter rape and molestation charges was particularly weak, whereas the evidence of Sutherby's possession of the depictions was strong. The argument was a pointed attempt to bolster the weaker charges with the evidence from the stronger charges. As explained above, we specifically consider strength and weaknesses of charges in the second *Russell* factor. Because the evidence against Bango was strong as to all charges, as we've already concluded above, *Sutherby* is distinguishable. This factor weighs against prejudice.

5. The Admissibility of Evidence of the Other Charges Even If Not Joined for Trial

The fourth severance factor asks whether evidence of each count would likely be cross-admissible under ER 404(b) if the court granted severance. *Russell*, 125 Wn.2d at 66. Under ER 404(b), [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as *proof of motive*, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. (Emphasis added.)

Bango argues that the witness tampering evidence would not have been admissible in a separate trial on the murder charge. Bango relies on *Sutherby* for the proposition that where evidence bearing on the respective charges would not be cross-admissible, an unacceptable risk arises that the jury will combine the evidence to infer a "general criminal disposition." Supp. Br. of Pet'r at 57 (quoting *Sutherby*, 165 Wn.2d at 883). Specifically, he argues that the only reason

the State offered the evidence of witness tampering was to show that, in regard to the murder charge, Bango did not shoot in self-defense.[9]

Bango argues he would be prejudiced if evidence of the murder charge had been admitted at a separate trial for the tampering charge, given the time that elapsed between its commission and the commission of the murders. Finally, he speculates that absent the tampering evidence, at least one juror would likely have voted to acquit him of murder and criminal impersonation.

The State argues that evidence of witness tampering would be cross-admissible to show consciousness of guilt regarding the murder and criminal impersonation, as the jury would have difficulty understanding the tampering charge without knowing the details of the underlying charges. Additionally, the State argues that the evidence regarding murder and impersonation would be admissible in regard to the tampering charge to show motive or to explain the events surrounding the crimes. The State cites *State v. Rodriguez*,[10] and *State v. Sanders*,[11] for the proposition that a defendant is not entitled to severance of witness tampering charges from the underlying charges because it is admissible "' evidence of consciousness of guilt in the trial of the

---

[9] Bango concedes that evidence of the shooting and Wikstrom's testimony to the shooting-involved felony would be relevant to some degree in a separate trial on the tampering charge to explain why Bango allegedly had a motive to tamper. But he nevertheless maintains that because the felony was homicide-related, admitting evidence of the killing of a white man (Shaw) by a black man (Bango), would cause significant prejudice in a separate trial on the witness tampering. To support this argument, Bango cites to two journal articles for the proposition that "Black people 'accused of killing a white victim are far more likely to be convicted'" than "'any other racial combination.'" Supp. Br. of Petitioner at 53 (quoting Alan I. Bigel, *Justices William J. Brennan, Jr. and Thurgood Marshall on Capital Punishment: Its Constitutionality, Morality, Deterrent Effect, and Interpretation by the Court*, 8 Notre Dame J.L. Ethics & Pub. Pol'y 11, 56 (1994)). This bias related argument and evidence from which we apparently are to infer bias in this particular case was not presented to the trial court. We decline to consider it here. RAP 2.5.

[10] 163 Wn. App. 215, 259 P.3d 1145 (2011).

[11] 66 Wn. App. 878, 833 P.2d 452 (1992).

charge to which the witness's testimony pertains.'" Resp't's Br. at 38 (quoting *State v. Rodriguez*, 163 Wn. App. 215, 228-29, 259 P.3d 1145 (2011)). We agree with the State.

The burden is on Bango to point to specific prejudice under the fourth factor. *Bythrow*, 114 Wn.2d at 720-21. Therefore, broad and speculative claims that the admission of evidence of the tampering charge prejudiced him is insufficient. *State v. McCabe*, 26 Wn. App. 2d 86, 97, 526 P.3d 891, *review denied*, 1 Wn.3d 1032 (2023).

Here, the evidence the State presented in regard to the murder and criminal impersonation charges would have been admissible in the tampering trial to show motive. Similarly, the evidence of tampering would be admissible in the murder and criminal impersonation charges to show consciousness of guilt. *Rodriguez*, 163 Wn. App. at 228-29.

Bango's reliance on *Sutherby* is misplaced, as we explained above that *Sutherby* is distinguishable. But moreover, *Sutherby*, the nature of the crimes—sex crimes and possession of depictions of minors engaged in sexually explicit conduct—were more inflammatory in nature and posed a higher risk of prejudice. *Sutherby*, 165 Wn.2d at 884 ("[J]oinder of charges can be particularly prejudicial when the alleged crimes are sexual in nature. . . In this context there is a recognized danger of prejudice to the defendant even if the jury is properly instructed to consider the crimes separately."). There is no similar danger of particularized prejudice here. Therefore, this factor as well weighs against prejudice.

Next, we weigh prejudice to the defendant caused by joinder against the need for judicial economy. *Slater*, 197 Wn.2d at 676. Bango asserts in conclusory fashion that the prejudice he suffered from joinder outweighed the benefit to judicial economy. We conclude joinder served judicial economy in light of lack of prejudice upon consideration of the *Russell* factors; there was no need for two trials.

In particular, Wikstrom, a witness to and participant in the events comprising the murder and criminal impersonation, was also the target of the witness intimidation count. Relatedly, Bango sought to silence Wikstrom about the events comprising the murder and criminal impersonation.

Accordingly, Bango fails to demonstrate prejudice sufficient to overcome the benefit to judicial economy. The same failure to demonstrate prejudice undermines Bango's claim of ineffective assistance of counsel.

C.    Ineffective Assistance of Appellate Counsel

Bango argues that he was denied effective assistance of appellate counsel because appellate counsel failed, in Bango's direct appeal, to raise the claims of (1) trial counsel's failure to sever and (2) an erroneous unlawful imprisonment jury instruction.

To prevail on a claim of ineffective assistance of appellate counsel, petitioner must demonstrate the merit of any legal issue appellate counsel failed to raise and also show he was prejudiced. *In re Pers. Restraint of Netherton*, 177 Wn.2d 798, 801, 306 P.3d 918 (2013).

Bango argues appellate counsel was ineffective because they failed to raise the issue of trial counsel failing to file a motion to sever. However, because, as previously analyzed, Bango fails to demonstrate under the *Russell* factors that if trial counsel had filed a motion to sever, it would likely have been granted, or that he was prejudiced by joinder, this claim fails.

Bango also argues appellate counsel was deficient because they failed to raise the issue of an erroneous jury instruction as part of direct appeal. He then argues this adds to a cumulative effect of the errors at trial and denied him a fair trial. However, as we discuss below, not only does his cumulative error claim fail, but he also fails to overcome the strong presumption that counsel's performance was reasonable as bald assertions and conclusory allegations are

insufficient. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). Accordingly, Bango's claim that appellate counsel was deficient fails.

III.     UNLAWFUL IMPRISONMENT INSTRUCTION

Bango argues that he was denied a fair trial when the court needlessly instructed the jury regarding unlawful imprisonment. He argues that the instruction was unnecessary because he was not charged with unlawful imprisonment, and that it had the effect of reducing the State's burden of proof in the murder and criminal impersonation counts because the mental state for unlawful imprisonment is "knowingly," whereas the mental state for murder is "intentionally." The State counters, arguing that Bango fails to provide evidence to overcome the presumption the jury was properly instructed as to the elements of all the charged crimes. The State further argues that Bango had an opportunity to object to the instruction and did so, to which the court then provided accompanying instructions defining "knowingly" and "restrain" over his objection. We agree with the State.

Jury instructions are foundational in our criminal proceedings. *State v. Weaver*, 198 Wn.2d 459, 465, 496 P.3d 1183 (2021). Therefore, a trial court should ensure that the jury understands the law and that the jury instructions, when read as a whole, are not misleading and permit the defendant to present his theory of the case. *Id*. at 456-66.

We presume that the jury followed the court's instructions. *McDaniel*, 155 Wn. App. at 861. "We review jury instructions de novo, within the context of the jury instructions as a whole." *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006).

Here, the instruction informed the jury that it could find that unlawful imprisonment, as defined could serve as an unlawful purpose for the crime of criminal impersonation. The record does not reflect that the jury was confused by the instruction.

22

When read as a whole, jury instructions 48 through 50 quickly resolve any alleged ambiguity. This set of instructions clearly communicated to the jury that unlawful imprisonment, for purposes of Bango having committed an unlawful act in the commission of criminal impersonation, is defined as knowingly restricting another's movement. The instruction did not affect the jury's consideration of the murder or witness tampering counts.

Further, this case is different from those cited by Bango. In *Kyllo*, 166 Wn.2d at 863, the "act on appearances" jury instruction misstated the law when it told the jury that a person is entitled to act in self-defense "only if he believed in good faith and on reasonable grounds that he was in actual danger of great bodily harm." (Internal quotation marks omitted.) However, "the jury should have been informed . . . that a person is entitled to act in self-defense when he reasonably apprehends that he is about to be injured. One is not required to believe he is about to be grievously harmed or killed." *Id*. As a result, the instruction "incorrectly stated that Kyllo had to apprehend a greater degree of harm than is legally required." *Id*.

Similarly, in *State v. Ackerman*, 11 Wn. App. 2d 304, 313, 453 P.3d 749 (2019), the trial court erred in using the term "violent felony" in the instructions for justifiable homicide and then stated that "'[r]obbery is a felony.'" As a result, this conveyed to the jury that robbery is not the type of felony that is a predicate for justifiable homicide. *Id*. Therefore, in both of those cases, there was either an additional or omitted term in the instructions that was misleading, resulting in an incorrect statement of law.

Here, there was no additional or omitted term or a misstatement of law that altered the burden of proof. Instead, Bango believes that the jury would not be able to discern the difference between unlawful imprisonment requiring a lower burden of proof and the other counts requiring intent. But Bango fails to explain why the jury would completely disregard the other instructions

23

for the crimes of murder and impersonation clearly stating the necessary mental state of intent. Accordingly, because we presume that the jury followed the court's instructions, and that the instructions when read as a whole clearly articulate the burden for each crime, the State was not relieved of its burden of proof in regard to the other counts requiring intent. *McDaniel*, 155 Wn. App. at 861.

IV.     CUMULATIVE ERROR

Finally, Bango argues that he was deprived of a fair trial under the cumulative error doctrine. Specifically, that the effect of trial and appellate counsel warrants reversal of his convictions.[12] The State responds, arguing that Bango's cumulative error fails because there is no error to accumulate as counsel's performance was not deficient, nor did he overcome the presumption that the jury understood and followed all of the court's instructions. We agree with the State.

The cumulative error doctrine applies where a "combination of trial errors denies the accused a fair trial even where any one of the errors, taken individually, may not justify reversal." *In re Det. of Coe*, 175 Wn.2d 482, 515, 286 P.3d 29 (2012). A cumulative error claim that relies on a single, nonprejudicial error fails. *See, e.g.*, *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012); *State v. Yarbrough*, 151 Wn. App. 66, 97-98, 210 P.3d 1029 (2009).

Because we find no single error, Bango's cumulative error claim fails.

---

[12] Bango also appears to ask us to consider errors raised in his direct appeal and SAG when looking at the totality of the circumstances. But because his cumulative error argument fails, he consequently also fails to establish that the interests of justice require that we reexamine these issues. Accordingly, we do not.

CONCLUSION

We hold that Bango fails to show any grounds for relief from personal restraint. Accordingly, we deny his petition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, J.

We concur:

Cruser, C.J.

Che, J.